853 F.2d 163
 57 USLW 2093, 6 UCC Rep.Serv.2d 732
 John M. ADAMS, Jr., et al., Appellants,
v.
MADISON REALTY & DEVELOPMENT, Inc., a corporation;
Consolidated Mortgage Company, a corporation; American
Funding Limited, a partnership; First American Services,
Inc., a corporation; John Peter Galanis and Chandra
Galanis; Jay Botchman; Tri-County Savings and Loan
Association, a state chartered savings and loan association;
Community Federal Savings and Loan Association, a federal
savings and loan association; First Northern Cooperative
Bank, a state chartered mutual savings bank; Empire of
America Federal Savings Bank, a federally chartered savings
bank; Empire of America Federal Savings Bank Deland
Florida, a federally chartered savings bank;
Barclays/American Businesscredit, Inc., a corporation;
Public Loqan Company, Inc., a corporation; Morris Cofman;
MXC Holdings, Ltd., a corporation; Arthur Mason; Leff &
Mason, a partnership; and Friedman & Shaftan, P.C. a
professional corporation, Federal Savings and Loan Insurance
Corporation, as receiver for Tri-County Savings and Loan Association.
 No. 88-5111.
 United States Court of Appeals,
Third Circuit.
 Submitted Pursuant To Third
Circuit Rule 12(6)
 May 10, 1988.
Decided July 22, 1988.
Rehearing and Rehearing In Banc Denied Aug. 29, 1988.
 
 Kenneth N. Laptook, Kimmelman, Wolff & Samson, Roseland, N.J., Marcus E. Crahan, Jr., Crahan, Javelera, Ver Halen & Aull, Los Angeles, Cal., for appellants.
 Mark F. Hughes, Jr., Robinson, Wayne, Levin, Riccio & LaSala, Newark, N.J., Richard E. Moot, Moot & Sprague, Buffalo, N.Y., Robert B. Fiske, Jr., Davis Polk & Wardwell, New York City, for appellee Empire of America Federal Sav. Bank.
 Before GIBBONS, Chief Judge, GREENBERG and WEIS, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 The district court entered summary judgments in favor of the purported indorsee of promissory notes and certified a controlling question of law pursuant to 28 U.S.C. Sec. 1292(b). The issue presented on this appeal is whether a good faith purchaser is a holder in due course of promissory notes containing indorsements on separate sheets of paper loosely inserted within each note. We answer in the negative and will vacate the judgments.
 
 
 2
 The saga of this litigation is extensive and quite complicated. However, the question certified to us is narrow, and the essential facts are easily summarized.
 
 
 3
 Plaintiffs executed promissory notes in payment for investments in Madison Partnerships, a series of tax shelters formed to acquire and operate residential real estate properties. Each of the promissory notes were made payable to one of three originator banks: Tri-County Savings & Loan Association of New Jersey, Community Federal Savings & Loan Association of Connecticut, and First Northern Cooperative Bank of New Hampshire. After a series of transfers, the notes came into the possession of defendant Empire of America Federal Savings Bank.
 
 
 4
 Charging fraud in connection with the investment scheme, plaintiffs filed suit against numerous defendants who allegedly participated in the wrongdoing. Also named as a defendant was Empire, from whom plaintiffs sought rescission of the notes now in the bank's possession. The discrete issue before us is the legal effect of purported indorsements not physically attached to the notes.
 
 
 5
 Empire purchased the thirty-five promissory notes challenged in this appeal for $19.5 million in March 1985 as part of a bulk acquisition of negotiable instruments. According to the bank's affidavits, the practice of acquiring notes through this "secondary market" is an established commercial banking practice. It allows smaller lenders to preserve liquidity and diversify risks, while permitting larger institutions to buy notes at discounted prices.
 
 
 6
 In November 1984, Consolidated Mortgage Company sold to Empire for $6.1 million a package of 116 notes executed by investors in conjunction with the Madison Partnership venture. In early 1985, Putnam Funding Company offered Empire a similar batch of notes which included the 35 instruments executed by plaintiffs. This collection consisted of 267 notes tendered at a purchase price of $19.5 million dollars.
 
 
 7
 On March 4, 1985 an Empire representative conducted a four-hour random review of 52 of the 267 loan files associated with the proposed Putnam transaction. He examined the supporting file material, including loan applications, credit reports, disbursal sheets, and current income tax 1040 forms. The documents indicated that the makers of the notes had substantial means, with individual net worths generally in excess of $500,000 and adjusted annual gross incomes usually greater than $100,000. None of the notes was found to be delinquent or beyond maturity.
 
 
 8
 Empire's representative could not recall whether he had inspected the notes. He did report, however, that he was satisfied with the financial condition of both borrowers and servicer and would recommend the purchase. On the following day, Empire's management loan committee approved the transaction and wired a transfer of $19.54 million dollars to Putnam.
 
 
 9
 On March 20, 1985 an examiner from the Federal Home Loan Bank Board met with Empire's internal auditors to inquire whether the bank had any contact with certain persons then under investigation for conduct unrelated to these purchases. The examiner's list included some of the individuals who had negotiated the sale of the Consolidated and Putnam notes to Empire. The district judge found that the examiner's report, shown to Empire personnel, did not contain specific allegations of fraud and had no apparent connection to the notes under discussion.
 
 
 10
 Plaintiffs allege that both Consolidated and Putnam participated in the asserted fraud. No evidence of record, however, demonstrates that Empire played any role in the original investment proposals.
 
 
 11
 On March 28, 1985 Empire's Board of Directors ratified the purchase. Twelve days later, the original notes were sent to Empire.
 
 
 12
 The promissory notes are each two-page, fold-over documents. The front page names the originator bank and sets forth the repayment schedule. The reverse side contains printed agreement conditions and signature lines. Inserted loosely within the fold, lacking any physical attachment to the note, are two sheets of paper containing purported indorsements, the last of which is the transfer from Putnam to Empire.[1] Each note contains a provision directing that its terms be interpreted under the law of the state in which the originator bank is located--New Hampshire, Connecticut, and New Jersey, respectively.
 
 
 13
 The district court acknowledged that the use of a separate, unattached sheet of paper to carry the indorsements failed to comply with Uniform Commercial Code section 3-202(2), which reads: "An indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof." Conn.Gen.Stat.Ann. Sec. 42a-3-202(2) (West 1987); N.H.Rev.Stat.Ann. Sec. 382-A:3-202(2) (1961); N.J.Stat.Ann. Sec. 12A:3-202(2) (West 1962).
 
 
 14
 The court commented that the object of this statutory provision was "to protect subsequent purchasers from the risk that the present holder or a previous holder has negotiated the instrument to someone outside the apparent chain of title through a separate document." In view of this purpose, the court reasoned, even if the indorsee had been exposed to some risks, "that is no reason to absolve the notemakers, who are in no way injured by the use of an unattached indorsement, of their obligations."
 
 
 15
 The court observed that the makers of the notes in this case were not threatened with double liability because there "is no reasonable basis to fear that there are other indorsees to the notes in question other than Empire." Failure to properly attach the indorsements, therefore, was excused as "hypertechnical." Nevertheless, the court conceded that the issue was a "close one" which justified certification under 28 U.S.C. Sec. 1292(b).
 
 
 16
 On appeal, plaintiffs contend that the district court's ruling runs contrary to explicit language in the Uniform Commercial Code and decisional precedents. Admitting that the affixation requirement may be technical, plaintiffs assert that the privileged status of holder in due course is also a technical creation bestowed only after strict compliance with the statutory prerequisites.
 
 
 17
 Defendant argues that it is the rightful owner of the notes, that it purchased them for value, and that the unambiguous indorsements were intended by the parties to negotiate the notes. The bank insists that the "purely clerical omission" of proper affixation distinguishes this case from others in which collateral documents such as assignments, guarantees, or mortgages were denied effect as indorsements.
 
 I.
 
 18
 Whether a separate, unattached indorsement page can constitute a proper indorsement of a negotiable instrument is a question of state law. The parties concede there is no controlling precedent in any of the three relevant jurisdictions, but each state has adopted the Uniform Commercial Code. The briefs have not cited any case recounting facts close to those presented here,[2] nor has our independent research uncovered any such authority. We are left, therefore, largely to the wording of the Code itself.
 
 
 19
 Article 3 of the Uniform Commercial Code incorporated many portions of its predecessor, the Uniform Negotiable Instruments Law (NIL), drafted in 1896 by the National Conference of Commissioners on Uniform State Laws. By 1924, the NIL had been adopted in every state. See 2 F. Hart & W. Willier, Commercial Paper Under the Uniform Commercial Code Sec. 1.06, at 1-25 to -26 (1988). When it was transplanted into the 1956 draft of the Uniform Commercial Code, the indorsements provision was altered in only a minor respect. Section 31 of the NIL had specified that a proper indorsement "must be written on the instrument itself or upon a paper attached thereto." The Code substituted the words "so firmly affixed as to become a part thereof" for the phrase "upon a paper attached thereto."
 
 
 20
 Indorsement constitutes one step in the process of establishing the highly advantageous position of holder in due course, a status which cuts off certain defenses of previous parties to the instrument and which offers a procedural means for obtaining a judgment on the note promptly and inexpensively. See U.C.C. Sec. 3-305. As a condition for conferring this privileged position, the Code not unreasonably imposes a number of prerequisites.
 
 
 21
 A holder in due course must take the instrument for value, in good faith, and without notice that it is overdue, that it has been dishonored, or that a claim or defense to it exists on the part of any person. See U.C.C. Sec. 3-302(1). But preliminarily, a person seeking to become a holder in due course must satisfy the threshold requirements for becoming a "holder," the critical issue on this appeal.
 
 
 22
 The Code defines a holder as one "who is in possession of ... an instrument ... drawn, issued or indorsed to him or to his order." U.C.C. Sec. 1-201(20). Mere ownership or possession of a note is insufficient to qualify an individual as a "holder." The instrument must be obtained through a process the Code terms "negotiation," defined as "the transfer of an instrument in such form that the transferee becomes a holder." U.C.C. Sec. 3-202(1). If the instrument is payable to order--as is the case with the notes here--negotiation is accomplished "by delivery with any necessary indorsement." Id.
 
 
 23
 In explaining the requirement that the indorsement be on or firmly affixed to the instrument, the Official Comment states that the Code "follows decisions holding that a purported indorsement on a mortgage or other separate paper pinned or clipped to an instrument is not sufficient for negotiation. The indorsement must be on the instrument itself or on a paper intended for the purpose which is so firmly affixed to the instrument as to become an extension or part of it. Such a paper is called an allonge." U.C.C. Sec. 3-202 Official Code Comment (3).
 
 
 24
 We may assume, without actually deciding, that the loose indorsement sheets accompanying Empire's notes would have been valid allonges had they been stapled or glued to the notes themselves. Cf. All American Finance Co. v. Pugh Shows, Inc., 30 Ohio St.3d 130, 507 N.E.2d 1134, 1136-37 n. 3 (1987) (collecting cases showing disagreement among courts on how firmly indorsements must be affixed). Nevertheless, the fact remains that the indorsement sheets here were not physically attached to the instruments in any way, and thus patently fail to comply with the explicit Code prerequisite. Conceding the requirement's formalistic nature, we explore the arguments in support of its enforcement here.
 
 
 25
 The Code's requirement that an indorsement be "firmly affixed" to its instrument is a settled feature of commercial law, adopted verbatim by every American state, the District of Columbia, and the Virgin Islands. See 5 R. Anderson, Uniform Commercial Code Sec. 3-202:2, at 416 (3d ed. 1984) (citing codifications). With a unanimity unusual in decisional law, the directive has been faithfully observed.[3]
 
 
 26
 The historical origins of the provision have been chronicled to the days of the Law Merchant. See Pribus v. Bush, 118 Cal.App.3d 1003, 173 Cal.Rptr. 747, 749 (1981). The practice of multiple indorsements which accompanied the growth in commerce eventually led to acceptance of the use of allonges. See id.; Estrada v. River Oaks Bank & Trust Co., 550 S.W.2d 719, 725 (Tex.Civ.App.--Houston [14th Dist.] 1977, writ ref'd n.r.e.). Even today, however, numerous jurisdictions permit allonges only where, because of multiple indorsements, no additional space for signatures remains on the negotiable instrument. See, e.g., Pribus, 173 Cal.Rptr. at 751; Tallahassee Bank & Trust Co. v. Raines, 125 Ga.App. 263, 187 S.E.2d 320, 321 (1972). But see Crosby v. Roub, 16 Wis. 616, 626-27 (1863) (allonge permitted even where space remains on note).
 
 
 27
 When the drafters of the Uniform Commercial Code replaced the term "attached" in the NIL with the phrase "firmly affixed," they intended to make the use of allonges more difficult. See Hills v. Gardiner Savings Institution, 309 A.2d 877, 880-81 (Me.1973); Estrada, 550 S.W.2d at 728; 5 Anderson, supra, Sec. 3-202:05. Courts have advanced two justifications for the firmly-affixed requirement. The California Court of Appeals reasoned that the provision serves to prevent fraud, remarking that a signature innocently placed upon an innocuous sheet of paper could be fraudulently attached to a negotiable instrument in order to simulate an indorsement. Pribus, 173 Cal.Rptr. at 750. But cf. Lamson v. Commercial Credit Corp., 187 Colo. 382, 531 P.2d 966, 968 (1975) (allonge consisting of two legal sheets stapled to two small checks held valid because signing on checks themselves would have been impossible; "stapling is the modern equivalent of gluing or pasting").
 
 
 28
 The affixation requirement has also been cited for its utility in preserving a traceable chain of title, thus furthering the Code's goal of free and unimpeded negotiability of instruments. Nearly a century ago, the Supreme Court of Georgia declared it "indispensably necessary" that negotiable instruments "should carry within them the indicia by which their ownership is to be determined; otherwise, their value as a circulating medium would be largely curtailed, if not entirely destroyed." Haug v. Riley, 101 Ga. 372, 29 S.E. 44, 46 (1897). See also Crosby, 16 Wis. at 627 (permanently attached indorsements to instrument "travel with it wherever it might go"). Chancellor Hawkland writes that it would be "unreasonable to impose upon the indorsee the risk that the present holder or a prior holder had negotiated the instrument to someone not in the apparent chain of title by virtue of a separate document." 4 W. Hawkland & L. Lawrence, Uniform Commercial Code Series Sec. 3-202:05 (1984).
 
 
 29
 Defendant here argues that these considerations warrant enforcement of the requirement only against those persons who acquire the notes after issuance, not against the makers who undertook to repay the amount loaned by the bank. This argument overlooks the rights which pass to an indorsee. Through effective negotiation, the indorsee becomes a holder, acquiring the authority to discharge the obligation on the note by accepting payment. See U.C.C. Sec. 3-301. Until the maker pays a holder, he will not be discharged from his obligation. Thus, "if the primary party pays an instrument bearing an improper indorsement, he will not have paid a holder, and the true owner of the instrument may recover against the primary party." See 1 R. Aldermann, A Transactional Guide to the Uniform Commercial Code 633 n. 294 (2d ed. 1983).
 
 
 30
 From the maker's standpoint, therefore, it becomes essential to establish that the person who demands payment of a negotiable note, or to whom payment is made, is the duly qualified holder. Otherwise, the obligor is exposed to the risk of double payment, or at least to the expense of litigation incurred to prevent duplicative satisfaction of the instrument. These risks provide makers with a recognizable interest in demanding proof of the chain of title. Consequently, plaintiffs here, as makers of the notes, may properly press defendant to establish its holder status.
 
 
 31
 Plaintiffs have another reason for insisting on compliance with the Code's indorsement requirements. They allege their notes were procured by fraud and they wish to assert that as a defense to payment. As the Code provisions have been interpreted, however, the defense of fraud in the inducement is not available against holders in due course. See 6 Anderson, supra, Sec. 3-305:62. Thus, if Empire successfully establishes its status as a holder in due course, it will be able to expeditiously fend off the plaintiffs' fraud allegations and obtain a judgment on the notes.
 
 
 32
 Notwithstanding these concerns, defendant maintains that mere "clerical oversight" should not obscure its right to recover as a holder in due course on notes it purchased for value. There is some equitable appeal to this line of reasoning, but overriding considerations militate against it.
 
 
 33
 We must be mindful of the limitations imposed on federal courts sitting in diversity. Where an appeal to this court challenges an application of state law, we are not free to indulge our preferences as to how the common law should best develop. Falcone v. Columbia Pictures Indus., 805 F.2d 115, 118 (3d Cir.1986). When, as here, no controlling state case law guides our consideration, we are left to the "unenviable task" of predicting how the highest courts of Connecticut, New Hampshire, and New Jersey would rule were the question now before them--a review decried as "omniscient in a way that is not possible for mortals." Santiago v. Johnson Mach. & Press Corp., 834 F.2d 84, 84 (3d Cir.1987).
 
 
 34
 Fortunately, our review in this case does not demand such clairvoyance. When interpreting the attachment requirement, the courts "have been of one mind" that the lack of an indorsing signature on the instrument itself, or on a sheet "firmly affixed" to the instrument, is fatal to holdership. See, e.g., Bailey v. Mills, 257 Ala. 239, 58 So.2d 446, 447 (1952); Lopez v. Puzina, 239 Cal.App.2d 708, 49 Cal.Rptr. 122, 124-25 (1966); Lamson, 531 P.2d at 968; Shepherd Mall State Bank v. Johnson, 603 P.2d 1115, 1118 (Okla.1979); Estrada, 550 S.W.2d at 725; Crossland Sav. Bank FSB v. Constant, 737 S.W.2d 19 (Tex.Ct.App.--Corpus Christi 1987); Crosby, 16 Wis. at 627. As one treatise states, "[t]he unanimity of the courts in cases where the signature is separate from the instrument can be explained by a judicial perception that it is sound policy to require the indorsement to be on the instrument." R. Hillman, J. McDonnell, & S. Nickles, Common Law and Equity Under the Uniform Commercial Code p 11.02[b], at 11-18 (1985).
 
 
 35
 Where the state courts, the scholarly commentators, and the unambiguous language of the statute all admit of but one result, only an overwhelming equitable ground would warrant a departure from what is unquestionably settled law. Absent such a circumstance, the Code's express goal of national uniformity must prevail. See U.C.C. Sec. 1-102(2).
 
 
 36
 One premise underlying the defendant's position on appeal is that plaintiff makers, once they give up possession of the instruments, lack standing to contest subsequent developments occurring in the course of later negotiations. Yet, as we have seen, the obligors have a very real interest in determining whether the person demanding payment on the note is actually a holder.
 
 
 37
 The defendant's attempt to distinguish the district court's holding from the great weight of contrary precedent is similarly unpersuasive. Defendant argues that its indorsement sheets serve no collateral purpose other than to negotiate the notes, and that section 3-202(2) was intended only to prevent giving legal effect to purported indorsements contained in collateral purpose documents--such as mortgages and guaranties. This contention has been rejected by courts that have denied holder status to transferees relying on plain, unattached indorsement sheets. See Pribus, 173 Cal.Rptr. at 748; Duxbury v. Roberts, 388 Mass. 385, 446 N.E.2d 401, 403 (1983). Moreover, the same goals prompting adoption of the provision--prevention of fraud and ensuring an attached chain of title record--are equally served in applying the requirement here.
 
 
 38
 Empire is not in a strong position to justify equitable relaxation of a settled formality in the Code. That longstanding provision was enacted, after all, for the benefit of parties in Empire's position, commercial sophisticates that trade in the secondary market for negotiable instruments.[4] The provision is not ambiguous, nor can Empire assert excusable ignorance of an unusual local technicality, given the rule's universal application. The flaws in the notes should have been perceived quickly and readily cured. Instead, the record suggests that the failure to observe that Code formality was caused by nothing short of sheer carelessness.
 
 
 39
 Financial institutions, noted for insisting on their customers' compliance with numerous ritualistic formalities, are not sympathetic petitioners in urging relaxation of an elementary business practice. It is a tenet of commercial law that "[h]oldership and the potential for becoming holders in due course should only be accorded to transferees that observe the historic protocol." Hillman, McDonnell, & Nickles, supra, at p 11.02[b], at 11-17. In sum, we are not persuaded that defendant presents a credible case for nonapplication of the plain wording of the state statutes.
 
 II.
 
 40
 Denying the bank holder in due course status does not necessarily relegate it to simple contract remedies, claiming payment as a mere assignee subject to the plaintiffs' fraud defenses. Even though it is not entitled to the abbreviated proof granted to a holder in due course, Empire perhaps may benefit from the Code's shelter provision, succeeding to the rights of a holder in due course albeit not entitled to that status itself.
 
 
 41
 Section 3-201(1) of the Code embodies what has come to be known as the "shelter" or "umbrella" principle. It provides that transfer of an instrument will vest in the transferee "such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course." Ct.Gen.Stat.Ann. Sec. 42a-3-201(1) (West 1987); N.H.Rev.Stat.Ann. Sec. 382-A:3-201(1) (1961); N.J.Stat.Ann. Sec. 12A:3-201(1) (West 1962).
 
 
 42
 This section extends the accepted rule in commercial law that a transferor assigns to his transferee all the rights he had in the transferred note. U.C.C. Sec. 3-201 Official Code Comment (1). The shelter principle permits a transferee, who cannot satisfy the formal prerequisites of negotiation, to step into the shoes of his transferor, succeeding to the same rights and liabilities as his predecessor. 2 Hart & Willier, supra, Sec. 12.02.
 
 
 43
 If the transferor was a holder in due course, the transferee succeeds to the rights of a holder in due course, althoughbecause the purported negotiation failed--he does not enjoy the status of holder in due course. See Security Pac. Nat'l Bank v. Chess, 58 Cal.App.3d 555, 129 Cal.Rptr. 852 (1976) (provision assures transferee rights of transferor); Crossland Savings Bank FSB, 737 S.W.2d at 21 (if transferor is holder in due course, transferee can assert rights of holder in due course); Estrada, 550 S.W.2d at 728 (same). See also Great Western Bank & Trust Co. v. PIMA Savings & Loan Ass'n, 149 Ariz. 364, 718 P.2d 1017, 1020 (1986) (assignment to owner transferred rights of holder through shelter principle); Weast v. Arnold, 299 Md. 540, 474 A.2d 904, 909 (1984) (same.).
 
 
 44
 To attain its purpose of guaranteeing the transferor a ready market for his negotiable instrument, the shelter principle operates cumulatively. As some commentators explain, a transferee of a holder in due course takes through, rather than from, his transferor. Thus, if the transferor's predecessor was a holder but the transferor was not, the ultimate transferee may succeed to the rights of the original holder: the holder's rights pass through each assignee. See 5 Anderson, supra, Sec. 3-201:22; 1 Alderman, supra, at 630.
 
 
 45
 The commentary on this point, however, is not unanimous. Chancellor Hawkland observes that under both the NIL and the Code a question exists "whether a purchaser from a party who was denied protection of the shelter provision because he was a party to a fraud or illegality (or, under the Code, had notice of a defense or claim) obtains merely the rights of his transferor or whether he can succeed to the rights of a previous holder in due course." 4 Hawkland & Lawrence, supra, at 278-79.
 
 
 46
 Nevertheless, Official Code Comment (3)(a) implies that such a result is permissible, offering the following example:
 
 
 47
 "A induces M by fraud to make an instrument payable to A, A negotiates it to B, who takes it as a holder in due course. After the instrument is overdue B gives it to C, who has notice of the fraud. C succeeds to B's rights as a holder in due course, cutting off the defense."
 
 
 48
 See Weast, 474 A.2d at 909.
 
 
 49
 We are aware that section 3-201(3) grants a transferee for value a specifically enforceable right to have the unqualified indorsement of the transferor. However, actual "[n]egotiation takes effect only when the indorsement is made and until that time there is no presumption that the transferee is the owner." U.C.C. Sec. 3-201(3). This timing provision, a carryover from NIL Sec. 49, may pose problems for Empire.
 
 
 50
 In view of this litigation, it is incontestable that the bank is now on notice of the plaintiffs' fraud defense against the promoters. See Security Pac. Nat'l Bank, 129 Cal.Rptr. at 857. Comment 7 of the Official Comment to section 3-201(3) reiterates that until the indorsement is made, "the purchaser does not become a holder, and if he receives earlier notice of defense against or claim to the instrument he does not qualify as a holder in due course under Section 3-302(1)(c)."
 
 
 51
 In his treatise, Chancellor Hawkland submits that this post hoc provision may be unnecessarily harsh. He concedes, however, that "except in the case of depository bank/transferees, the clarity of subsection 3-201(3) has discouraged any court from holding otherwise." 4 Hawkland & Lawrence, supra, Sec. 3-201:09, at 286.
 
 
 52
 At this stage of the litigation, we cannot anticipate what course the bank may choose to follow in light of our decision here, nor can we predict the responses defendant may interject. We hold only that, on the present state of the record, Empire is not entitled to the status of a holder in due course.
 
 
 53
 The judgments in favor of Empire will be vacated and the case remanded for further proceedings consistent with this opinion.[5]
 
 
 54
 Costs will be taxed against Appellee.
 
 
 
 [1]
 The exemplar reprinted in the Appendix shows what appears to be two unattached sheets of paper containing indorsements. The first page contains the indorsement of Community Federal Savings & Loan to Consolidated Mortgage Company, Consolidated Mortgage Company to Barclays American/Business Credit, and Barclays American to Consolidated Mortgage. The second sheet records indorsements from Consolidated Mortgage to North American Trust Company, North American Trust Company to Putnam Funding Corporation, and Putnam Funding to Empire of America Federal Savings Bank
 
 
 [2]
 The closest authority, not cited by either party, appears to be National Bank v. Leonard, 91 Ga. 805, 18 S.E. 32 (1893). There, a bank had received two obligation notes, one folded inside another, with the purported indorsement on the exterior note only. The court ruled that this attempted negotiation did not qualify as an indorsement
 
 
 [3]
 The published authorities and legal commentators have identified only two decisions which have excused the attachment requirement and permitted the transferee to claim holder status. Mosely v. Graydon, 35 S.C.L. (4 Strob.) 7 (1849); First Nat'l Bank v. Bell, 88 S.W.2d 119 (Tex.Civ.App.--Fort Worth 1935, writ dism'd). Notwithstanding their obvious equitable appeal, these rulings have not persuaded other courts, but have been expressly disapproved. See, e.g., Lopez v. Puzina, 239 Cal.App.2d 708, 49 Cal.Rptr. 122, 124-25 (1966); Tennessee Valley Bank v. Williams, 246 Ala. 563, 21 So.2d 686, 688 (1945); Estrada v. River Oaks Bank & Trust Co., 550 S.W.2d 719, 726 (Tex.Civ.App.--Houston [14th Dist.] 1977, writ ref'd n.r.e.)
 
 
 [4]
 See Professor Gilmore's interesting discussion in Gilmore, Formalism and the Law of Negotiable Instruments, 13 Creighton L.Rev. 441 (1979)
 
 
 [5]
 Empire of America Federal Savings Bank has its principal place of business in Buffalo, New York. The parties have referred to this company as "Empire North." Empire's subsidiary, referred to in the record as "Empire South", has its administrative headquarters in Fort Worth, Texas and is incorporated under the name "Empire of America Federal Savings Bank, Deland, Florida."
 The district court concluded that, although the notes bear the legend "Pay to the order of EMPIRE OF AMERICA FEDERAL SAVINGS BANK" (Empire North), Putnam intended to indorse the notes to Empire South. The court found the misnomer in the designation of the transferee not material. We find no error in this ruling. See Swanson v. Commercial Acceptance Corp., 381 F.2d 296 (9th Cir.1967); First State Bank v. Cox, 192 Wis. 566, 213 N.W. 290 (1927).