SAROKIN, Circuit Judge,
dissenting:
The RTC as receiver accepts an insolvent institution’s portfolio in its then-posture. The RTC is entitled to rely upon what it discovers in the records of the institution in evaluating its financial condition and determining what future action to take as a result of that examination. The purpose of § 1823(e) is to avoid subjecting the RTC to claims or defenses not readily apparent from a reasonable inspection of the documents maintained by the insolvent institution in the ordinary course of its business. The RTC, as contrasted to the FDIC, has no discretion to deal with the institution’s assets and liabilities other than as it finds them.
Here, the fraud about which plaintiffs complain virtually leaps out from the documents, and it is thus eminently clear that there was evidence that the institution had knowledge and notice of the fraud when it acquired the loans. Clearly if Carteret acquired the loans with such knowledge, it took them subject to the claims and defenses of the defrauded borrowers. The question raised here is whether the applicable statute defeats those claims and defenses if asserted against the RTC. In my view it does not, and thus I respectfully dissent and would reverse.
I.
In reviewing this case below, the district court examined the third Loan Purchase Agreement between Carteret and GDV. Dimuzio, et al. v. RTC, No. 94-1559, 1994 WL 872620, slip op. at 14 (D.N.J. Nov. 15, 1994). Indeed, the Loan Purchase Agreements between GDV and Carteret are at the center of this ease, as they are written documents demonstrating that Carteret was aware that GDV’s appraisals were inflated above the fair-market value of the sites and did not conform to the standards of the Federal National Mortgage Association (“FNMA”) or the Federal Home Loan Mortgage Corporation (“FHLMC”). In all Carteret entered into three bulk purchase agreements with GDV. As to mortgages issued under GDV’s “Lot Trade Program,” in which plaintiffs participated, the commitment letter which was incorporated into the third purchase agreement provided:
Appraisal reports on the housing package and condominiums do not conform to FNMA/FHLMC guidelines. These ap *784 praisals are based on prices of comparable units sold by General Development and may not reflect the sales price of similar properties offered by local builders or the resale price of the home in the local market. Accordingly, there can be no assurance that the appraised value can be realized in the event of foreclosure, liquidation or sale of the property.
Appendix (“App.”) at 195. Carteret’s second bulk purchase agreement and the incorporated commitment letter with GDV contained very similar language. These two agreements also acknowledged that because the appraisals were non-conforming, the loans could not be sold to FNMA or FHLMC.[1]
II.
The majority’s general discussion of 12 U.S.C. § 1823(e) and the case law interpreting it, Opinion, at 780-81, is well presented, and I concur in their overall conclusion therein that § 1823(e) is applicable to the mortgages in this case.
A.
The majority correctly concludes that, under Langley v. FDIC, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) and Adams v. Madison Realty & Development, Inc., 937 F.2d 845 (3d Cir.1991) (“Adams II”), the misrepresentations alleged by plaintiffs in the inflated, non-conforming appraisals of the GDC properties constitute an “agreement” for purposes of § 1823(e). As we set forth in Adams II, “any warranty on which the performance of a party is conditioned is an ‘agreement’ within the meaning of section 1823(e).” Adams II, 937 F.2d at 853. See also FDIC v. Bathgate, 27 F.3d 850, 862 (3d Cir.1994) (agreements include “promises to perform acts [and] conditions to the performance of a party’s obligation”). Accordingly, we have held that misrepresentations underlying a claim of fraud in the inducement are “agreements” and hence enforceable against the RTC only when they satisfy the four requirements of § 1823(e). Adams II, 937 F.2d at 857. The misrepresentations in GDV’s appraisals are thus “agreements” for purposes of § 1823(e).
B.
Similarly, I agree with the majority that under Adams II we are constrained to conclude that, although plaintiffs executed the loans with something other than a depository institution, the loans are nonetheless subject to § 1823(e). Adams involved the application of § 1823(e) to a situation where, just as here, the RTC acquired notes initiated by a mortgage company by taking over a failed bank that had purchased the notes on the secondary market. Adams II, 937 F.2d at 850 (citing Adams v. Madison Realty & Development, Inc., 853 F.2d 163, 164-65 (3d Cir.1988) (“Adams I”)). In concluding that it was appropriate to apply § 1823(e) to the agreement in Adams II, we looked specifically to the fact that, even though the loans had been purchased on the secondary market, plaintiffs’ obligations ultimately ran to the failed bank when the bank acquired plaintiffs’ notes. Id. at 858.
The facts of Adams are indistinguishable from those in the instant case for purposes of determining whether § 1823(e) applies, and I thus agree with the majority that § 1823(e) necessarily applies here.
III.
Unlike the majority, however, I conclude that the home appraisals and Loan Purchase Agreements between GDV and Carteret should be considered as part of the “agreement” for purposes of § 1823(e).
In Langley, the Supreme Court held that misrepresentations made by a bank regarding the acreage of land, “the truthfulness of which was a condition to performance of [petitioners’] obligation to repay the loan,” constituted an “agreement” for purposes of applying § 1823(e). Langley v. FDIC, 484 U.S. at 90-91, 108 S.Ct. at 400-01. In my view it would be ironic and inconsistent to *785 give a broad meaning to “agreement” so as to incorporate oral representations and warranties, but then exclude written appraisals and loan documents upon which the parties relied in acquiring the loans. Thus, it is difficult to accept, under Langley’s analysis, that the written appraisals in this case “are not a written form of the representations and warranties regarding the real estate.” Opinion, at 781. Just as the petitioners in Langley, plaintiffs accepted loans based on representations by the lender that the plaintiffs now allege to be false. The written nonconforming appraisals in the instant case were acquired by GDV and were designed to support the selling price of the GDC houses. In providing these appraisals to plaintiffs without disclosing that they were inaccurate and did not conform to industry standards, GDV represented that the properties GDC was selling to plaintiffs were actually worth the appraisal amount — a condition upon which the plaintiffs relied. The appraisals thus plainly are part of the agreement. Adams II, 937 F.2d at 853 (holding “any warranty on which the performance of a party is conditioned is an ‘agreement’ within the meaning of section 1823(e)”).
In addition, in considering the “agreement” to which § 1823(e) applies, we must also consider the Loan Purchase Agreements between GDV and Carteret but for different reasons. It is through these Loan Purchase Agreements that Carteret has become the bank to which the plaintiffs are obliged. See Adams II, 937 F.2d at 858 (holding that plaintiffs became obligors to the failed bank that bought their promissory notes on the secondary market). While we held in Adams II that the application of §, 1823(e) should not be “limited to obligations between a bank and its obligor,” Adams II, 937 F.2d at 858, we also concluded that alternative grounds for applying § 1823(e) also existed — namely that the transferal of the loans to the failed bank meant that the plaintiffs were the obli-gors of the bank, and that the statute applied because of that link. This is the exact situation that exists here; the plaintiffs are Car-teret’s obligors. It is only logical, then, that the documents transferring plaintiffs’ obligations to Carteret — the Loan Purchase Agreements — be considered as part of the agreement for purposes of applying § 1823(e).
Furthermore, we must remember that one of the principal purposes of § 1823(e) is “to allow federal and state bank examiners to rely on a bank’s records in evaluating the worth of the bank’s assets.” Langley, 484 U.S. at 91,108 S.Ct. at 401 (emphasis added). Indeed, in Adams II, this court examined “the extent [to which the] promises [at issue] were made a part of the bank’s official records.” Adams II, 937 F.2d at 857 (emphasis added). The contents of Carteret’s official records, complete with the Loan Purchase Agreements and the home appraisals, then, are the appropriate subject of the § 1823(e) analysis. It is from these official records that one could find that the RTC could evaluate the worth of Carteret’s assets and examine these appraisals and agreements and indeed, discover the fraud alleged by the plaintiffs.[2]
This conclusion is not undermined by the Supreme Court’s decision in Langley. There, the Supreme Court ruled that the FDIC’s knowledge of a misrepresentation at the time it acquired a note is not relevant to whether § 1823(e) applies. Langley, 484 U.S. at 94, 108 S.Ct. at 401. The Court reasoned that:
[h]arm to the FDIC ... is not avoided by knowledge at the time of acquiring the note. The FDIC is an insurer of the bank, and is hable for the depositors’ insured losses whether or not it decides to acquire the note. The harm to the FDIC caused by the failure to record occurs no later than the time at which it conducts its first bank examination that is unable to detect the unrecorded agreement and to prompt the invocation of available protective mea *786 sures, including termination of the bank’s deposit insurance. Thus, insofar as the recording provision is concerned, the state of the FDIC’s knowledge at that time is what is crucial.
Id. at 94-95, 108 S.Ct. at 403 (citations omitted).
In the RTC’s context, by contrast, knowledge of a bank’s assets is important at the time the RTC acquires them, not before. There are no measures the RTC could take to protect itself before this time, as opposed to the FDIC which could opt not to insure a bank. In this case, the purpose of the recording provision is to apprise the RTC of the bank’s assets so it can determine the appropriate course of action, and the RTC looks to the bank’s official records in order to do this.
IV.
Concluding as I do that the “agreement” to be considered here includes the home appraisals and Loan Purchase Agreements, I now look to see whether this agreement meets the four requirements of § 1823(e). I believe that it does.
A.
In considering whether the agreement meets the “in writing” condition of § 1823(e)(1), we have held that “no agreement between a borrower and a bank which does not plainly appear on the face of an obligation or in the bank’s official records is enforceable against the FDIC.” Adams II, 937 F.2d at 852. More recently, we “slightly extend[ed]” Adams II to add that, “not only does the existence of the agreement have to appear plainly on the face of an obligation, but the basic structure of that agreement— its essential terms — must also appear plainly on the face of that obligation.” RTC v. Daddona, 9 F.3d 312, 319 (3d Cir.1993). See also Bathgate, 27 F.3d at 864.
Not surprisingly, in “misrepresentation” cases, plaintiffs have often faded to satisfy the writing requirement. See Langley, 484 U.S. at 89, 108 S.Ct. at 400 (“No reference to these representations appears in the documents executed by [plaintiffs]”); Adams II, 937 F.2d at 857 (“Since plaintiffs did not make these promises part of the official records, they are estopped from raising their claims of fraud in the inducement against the RTC”); Daddona, 9 F.3d at 317; Bathgate, 27 F.3d at 865-66. In most instances of fraudulent inducement, it would be rare to find the fraud in the documents themselves. But bearing in mind that the documents must place the RTC on notice, the requirement is sound.
The district court concluded that, in this instance, the writing requirement was satisfied. For reasons I explained above, I believe that the district court correctly looked to Carteret’s records and the third Loan Purchase Agreement with GDV, which acknowledged that the appraisals were nonconforming and likely in excess of the fair market value, as well as the appraisals themselves. Dimuzio, et al. v. RTC, No. 94-1559, 1994 WL 872620, slip op. at 14 (D.N.J. Nov. 15, 1994). The non-conformity of the appraisals, and importantly the recognition that the appraisals may not reflect the fair market or resale value of the properties, “plainly appear on the face,” Adams II, 937 F.2d at 852, of the second and third Loan Purchase Agreements. App. at 190-91, 195. Moreover, the “basic structure” of the alleged misrepresentation, Daddona, 9 F.3d at 317, namely the reliance on non-conforming, inflated appraisals in calculating the plaintiffs’ mortgages, appears plainly on the face of the agreements. Thus, although the commitment in writing of representations that fraudulently induce borrowers to execute a loan may be rare, I conclude that such is the case here and that the first criteria of § 1823(e) is satisfied.
B.
The district court dismissed plaintiffs’ complaint on the ground that Carteret’s Loan Purchase Agreement from GDV was not executed contemporaneously with the original mortgages between GDV and plaintiffs, thus failing the requirement of § 1823(e)(2). Certainly it is undisputed that these two transactions were separated by a period of years. I believe the district court’s conclusion, however, is premised on a flawed construction of § 1823(e)(2).
We have not previously considered the meaning of the “contemporaneous execution” *787 condition, but a split may be emerging among other circuits. Some courts have strictly enforced this requirement. See, e.g., FDIC v. La Rambla Shopping Center, Inc., 791 F.2d 215, 220 (1st Cir.1986) (lease executed two years before note unenforceable); Cardente v. Fleet Bank of Maine, Inc., 796 F.Supp. 603, 611 (D.Me.1992) (lease executed two weeks before note unenforceable, where note lacks any reference to lease); RTC v. Crow, 763 F.Supp. 887, 892-94 (N.D.Tex.1991) (refinancing agreement signed three years after execution of original loan unenforceable).
More recently, however, the Eighth Circuit suggested that the contemporaneous execution requirement might be best understood in light of “general business practice.” FDIC v. Manatt, 922 F.2d 486, 489 n. 4 (8th Cir.1991) (observing accord and satisfaction will necessarily be executed subsequent in time to original note), cert. denied, 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991).[3] Adopting the Eighth Circuit’s suggestion, the Ninth Circuit held that “satisfaction of the contemporaneousness requirement should be considered in light of commercial reality.” RTC v. Midwest Federal Sav. Bank of Minot, 36 F.3d 785, 797-98 (9th Cir.1993). The Ninth Circuit went on to conclude that a commitment letter executed more than two months before loan documents had satisfied the contemporaneous execution requirement. Id. See also Erbafina v. FDIC, 855 F.Supp. 9, 12 (D.Mass.1994) (commitment letter negotiated several days before execution of loan satisfies § 1823(e)(2)).
A review of the legislative history of § 1823(e), which was enacted in 1950 and slightly amended in 1989, lends no insight into the legislative intent behind the contemporaneous execution requirement. See H.R.Rep. No. 2564, 81st Cong., 2d Sess. (1950), reprinted at 1950 U.S.C.C.A.N. 3765; Conf.Rep. No. 3049, 81st Cong., 2d Sess. (1950), reprinted at 1950 U.S.C.C.A.N. 3776; H.R.Rep. No. 54(1), 101st Cong., 1st Sess. (1989), reprinted at 1989 U.S.C.C.A.N. 86; Conf. Rep. No. 222, 101st Cong., 1st Sess. (1989), reprinted at 1989 U.S.C.C.AN. 432.
On balance I am persuaded by the reasoning of the Eighth and Ninth Circuits and conclude that § 1823(e)(2) must be read in light of commercial reality. When there exists a secondary market for mortgage notes, the original loan and subsequent acquisition will never be precisely contemporaneous. Nonetheless, where execution of a side agreement either (1) is contemporaneous with origination of a note, and the “basic structure of the agreement,” Daddona, 9 F.3d at 319, is evident from the face of the resale documents, or (2) is contemporaneous with a bank’s acquisition of a note in the secondary market, then § 1823(e)(2) should be satisfied.
In addition to the respect for common sense and commercial reality which shaped the decisions of the Eighth and Ninth Circuits, my conclusion is supported by several other considerations. First, it would be contradictory and illogical to rely on the Loan Purchase Agreements as the link that made plaintiffs Carteret’s obligors and thus requires that § 1823(e) applies in this case, but then disregard those same agreements in considering § 1823(e)(2).
Second, my construction of § 1823(e)(2) comports with the legislative intent identified by the Supreme Court as underlying § 1823(e), namely that bank examiners be on notice of the real worth of an asset, that “unusual transactions” be approved by senior bank officials, and that “new terms” not be added to a loan subsequent to its origination. Langley, 484 U.S. at 92, 108 S.Ct. at 401-02. These concerns are met by enforcing the requirement that either (1) a side agreement be executed contemporaneous with a bank’s acquisition of a note on the secondary market, or (2) it be executed contemporaneous with execution of an original note and that its basic structure be clear from the face of the subsequent resale documents.
*788 Finally, to hold otherwise would immunize the RTC from honoring an otherwise valid collateral agreement — one done in "writing, contemporaneous with the origination or resale of the loan, approved by a bank’s directors, and maintained continuously in its records — simply because the loan was resold on the secondary market. Taken to its extreme, the contemporaneousness requirement could deny relief to defrauded borrowers even if the subsequent loan purchase documents specifically acknowledged the existence of a likely fraud claim or defense based upon the initial transaction, and the purchase was openly discounted as a result.
Here, the “agreement” — GDVs inflated, non-conforming appraisals — is referenced in writing and in detail in the very same documents by which Carteret acquired the mortgages. These references are thus contemporaneous with Carteret’s acquisition of the notes. Bank examiners were on notice of the problems "with the mortgages, senior Carter-et officials had the opportunity to review these “unusual transactions,” and there is no allegation that “new terms” were added after the purchase agreement. Hence I conclude that plaintiffs have satisfied the contemporaneous execution condition of § 1823(e)(2).
C.
On this appeal the RTC does not contend that the final two criteria of § 1823(e) — approval by Carteret’s board of directors and continuous maintenance of the loan documents in Carteret’s records — are unmet, except in a brief aside that cites to nothing in the record but states “[t]he representations, warranties and conditions that Appellants seek to enforce are not in writing, and hence were not executed by Appellants or by Car-teret.” RTC Brief at 12.
I have already urged that the discussion of the inflated, non-conforming appraisals in the Loan Purchase Agreements are adequate to satisfy the writing requirement of § 1823(e)(1). The only evidence of record before us shows that the Loan Purchase Agreements, as well as the commitment letters which are incorporated into the purchase agreements, bear signatures of various Car-teret, GDC, and GDV officials. App. at 182, 187, 189, 192, 199, 209, 222. In addition, the Complaints allege that plaintiffs executed mortgages which were originated by GDV. App. at 39, 90.
Accordingly, I would not affirm the order of the district court on the ground that the third or fourth conditions of § 1823(e) are unsatisfied.
V.
It is undisputed that the plaintiffs in this matter were defrauded. Carteret accepted the loans with knowledge of that fraud, and that knowledge was readily ascertainable from a reasonable inspection of the loan documents. Neither the purpose or language of the statute would be satisfied by denying plaintiffs the right to assert such fraud so readily apparent and so flagrant.
For the foregoing reasons, I would reverse the order of the district court.

. Carteret’s first commitment letter with GDV did not state that the appraisals were non-conforming or the reason for this failure, but Carter-et did acknowledge "[w]e also understand that these loans are not salable [sic] to FNMA.” App. at 179. It is not clear from the complaint whether Carteret purchased plaintiffs’ mortgages pursuant to the first, second, or third agreement.

. Indeed, when considering a motion to dismiss under Rule 12(b)(6), courts are to determine "whether in the light most favorable to the plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief.” 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1357, at 332-36. Under such a standard, any doubts as to whether the non-conforming nature of the appraisals put Carteret and the RTC on notice that plaintiffs had been defrauded must thus be resolved in plaintiffs’ favor.

. Prior to its decision in Manatt, the Eighth Circuit had relied on a strict interpretation of the contemporaneousness requirement to conclude that a side agreement executed five months before the making of a note was unenforceable. FDIC v. Virginia Crossings Partnership, 909 F.2d 306, 309-10 (8th Cir.1990). However, Manatt suggests that Virginia Crossings may no longer be good law in the Eighth Circuit, although the panel there declined to overrule it explicitly since “an interpretation of [i 1823(e)(2)] [was] not necessary to a decision in [that] case.” Manatt, 922 F.2d at 489 n. 4.