John M. ADAMS, Jr., Jacqueline Adams, Dennis R. Absher, Robert J. Absher, Harvey L. Alpern, Barbara Alpern, Pamela M. Anthony, Charles M. Aronson, Joy Aronson, Art Baer, Raymond L. Bille, Karla M. Bille, Milton M. Birnbaum, Davis Black, James E. Blum, Dorothy Blum, John M. Bollinger, Beverly Bollinger, M. Fred Brannock, John E. Brittain, III, Carol A. Brittain, Herbert Bronsten, Miriam Bronsten, John Burkey, Cynthia A. Burkey, Esequiel Campos, Elva M. Campos, Richard Caster, Nancy Caster, David Cee Cates, Lyn Cates, David H. Cauble, Darlos Cauble, Milton J. Chasin, John A. Collins, Lee Collins, Carole J. Conti, Christopher Crowe, Linda Crowe, Peter C. Cullen, David L. Cunningham, Berneice P. Cunningham, Donald W. Daymon, Lucille Daymon, Rene Del Re, Daycel B. Del Re, Joseph M. DeMarco, Louis Demorales, Kathe G. Demorales, E. Michael De Santis, William A. Dial, Joy A. Dial, Larry W. Drehs, Cynthia A. Drehs, David A. Drummond, Sylvia Drummond, Alain F. Du Puis, Yary Du Puis, William D. Edwards, John R. Elerding, S. Linda Andrieux Elerding, Gerd H. Ernst, Theodora Ernst, John J. Fitch, Sandra F. Fitch, Thomas M. Fontana, Susan Lewis Fontana, Richard E. Foringer, Warren H. Fox, Roberta H. Fox, William Francis, Leo Frischman, Suzanne Furst, Howard Furst, Edward F. Gill, Sylvelyn D. Gill, Marcel Goldfarb, Ruth Goldfarb, Lisa Goldman, Howard Goldman, Irvin Goodman, Dorothy Goodman, Richard H. Grey, Sallie V. Grey, Richard R. Grey, Catherine L. Grey, Karl G. Grothues, Mechtild Grothues, W. Halliday Randall, Charles T. Harris, Carolyn L. Harris, John R. Hartman, Barbara Hartman, John T. Hedgepeth, Jr., Mary W. Hedgepeth, Hanns Hederer, Angelika Hederer, Orville G. Hiepler, Florence L. Hiepler, William C. Holmes, Bonnie Holmes, Richard Huetter, Maria Luise Huetter, Carol A. Imle, John F. Imle, Jr., Charles W. Jackman, Yvonne I. Jackman, Rand L. Jackson, Martha Jackson, Donald D. Jeffries, Virginia J. Cypiers, Carlos Jimenez, M. Ricarmen Jimenez, Indersit Amar, James L. Keating, Kathy K. Keating, Roger L. Keech, George T. Keen, Jr., Sally J. Keen, D. Frederick Knudson, Christine Knudsen, Edyth C. Koch, Martin L. Kove, Vivienne Kove, Richard J. Kuhn, Arlene Kuhn, Jean B. La Fond, Lulie E. La Fond, Nicol R. Laly, David E. Lang,

Grace Lang, Mitchell C. Latter, Elias Lazarides, Catherine Lazarides, Chun B. Lee, John W. Leggat, III, Nancy Jane Leggat, Victor Lobl, Harry A. Louie, Delores C. Louie, Alexander C. MacDonald, Dorothe MacDonald, John Erick Mack, Jr., Dagmar Mack, James E. Martin, John Masius, Donald S. Mayes, Josephine E. Mayes, Joseph McDaniel, Mary McDaniel, David E. Miller, Toni R. Miller, Lee Miller, Michael J. Moss, Romain Oliver Nelsen, Richard A. Neumeyer, Leonard M. Okun, Ted L. Olsen, Elise E. Olsen, Dhiru G. Patel, Jyoti D. Patel, Ramesh R. Patel, Ronald J. Patterson, Cynthia Patton, Leonard Pearlman, Cindy Pearlman, Ronald Pearlman, Laurie Pearlman, Thomas Powell, Anthony E. Romero, Andrew Rudd, Virginia A. Rudd, James K. Ruxin, Howard Sadowsky, Judith Sadowsky, Vikram Shah, Jyoti Shah, Frederick C. Shaller, Kimberly W. Shaller, Howard Shapiro, Joan A. Shapiro, Steven M. Shaw, Marcella J. Shaw, Bernard Shearer, Beverly Shearer, George M. Sheram, Arthur Michael Solender, Elsie Solender, Stephen Lawrence Solender, Benjamin S. Song, Jennifer Song, Joseph Stall, Phyllis L. Stall, Terence T. Stay, Jack Strauss, Jeff Strong, Michael R. Sullivan, Elyse E. Sullivan, John E. Swan, Linda G. Swan, Stephen R. Targan, Janne Targan, Harold A. Thompson, Jay Thompson, Shirleta Richards–Thompson, Steven Tisherman, Arleen Tisherman, Kalyanasundaram Venkataraman, Lorna G. Ventataraman, Troy Verrett, Charlene Verrett, Donald Volz, Kay A. Volz, William H. Walsh, Yui L. Wang, Ronald E. Williams, Kathryn M. Williams, Wanda Wilson, Joseph I. Wilson, Harbajan Singh Kyalsa Yogiji, BVW Investments,

v.

MADISON REALTY & DEVELOPMENT, INC., a Corporation, Consolidated Mortgage Company, a Corporation, American Funding Limited, a Partnership, First American Services, Inc., a Corporation, John Peter Galanis, Chandra Galanis, Jay Botchman, Tri–County Savings and Loan Association, a State Chartered and Loan Association, Community Federal Savings and Loan Association, a Federal Savings and Loan Association, First Northern Cooperative Bank, a State Chartered Mutual Savings Bank, Empire of America Federal Savings Bank, a Federally Chartered Savings Bank, Empire of America Federal Savings Bank, Deland, Florida, a Federally Chartered Savings Bank, Barclays/American Business Credit, Inc., a Corporation, Public Loan Company, Inc., a Corporation; Morris Cofman, MXC Holdings, Ltd., a Corporation; Arthur Mason, Leff & Mason, a Partnership, Friedman & Shaftan, P.C., a Professional Corporation; Federal Savings and Loan Insurance Corporation, as Receiver for Tri–County Savings and Loan Association, Resolution Trust Corporation, as Receiver for Empire of America Federal Savings Bank and Resolution Trust Corporation as Conservator of Empire Federal Savings Bank of America.

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION as Receiver for Tri–County Savings and Loan Association, Counterclaim Plaintiff,

v.

Pamela ANTHONY, Charles Aronson, Joy Aronson, David Black, John Bollinger, Beverly Bollinger, John Brittain, III, Carroll Ann Brittain, Eseqiel Campos, Elva Campos, Richard Caster, Nancy Caster, David Cates, Lyn Cates, John Collins, Lee Collins, Christopher Crowe, Linda Crowe, Robert S. Deleo, Margaret Deleo, Joseph DeMarco, William Dial, Joy Dial, Thomas Fontana, Susan Lewis Fontana, Howard Furst, Edward Gill, Sylevlyn Gill, Irvin Goodman, Richard H. Grey, Sallie Grey, Richard R. Grey, II, Catherine L. Grey, John Hartman, Barbara Hartman, Hanns Hederer, Angelika Hederer, John Hedgepeth, Jr., Mary Hedgepeth, Orville Hiepler, Florence Hiepler, William Holmes, Bonnie Holmes, Richard Huetter, Mary Luise Huetter, Donald

Jeffries, Virginia Jeffries, Carlos Jimenez, Maricarmen Jimenez, Inderjit Kaur, George Keen, Jr., Sally Ken, Frederick Knudson, Christine Knudsen, Martin Kove, Vivienne Kove, Richard Kuhn, Arlene Kuhn, Mitchell Latter, John Leggat, III, Nancy and Leggat, Victor Lobl, Harry Louie, Delores Louie, John Erick Mack, Jr., Dagmar Maria Mack, Alexander MacDonald, Dorothe MacDonald, Joseph McDaniel, Mary McDaniel, James Martin, David Miller, Toni Miller, Michael Moss, Leonard Okun, Ted Okun, Ted Olsen, Elise Olsen, Cynthia Patton, Thomas Powell, Howard Sadowsky, Judith Sadowsky, Vikramkumar Shah, Jjyoti Shah, Frederick Shaller, Kimberly Shaller, Howard Shapiro, George Sheram, Joseph Stall, Phyllis Stall, Jeff Strong, William Edwards, John Swan, Linda Swan, Stephen Targan, Janne Targan, Kalyanasundaram Venkataraman, Lorna Venkataraman, Harbhajan Singh Kkhalsa Yogiji, Counterclaim Defendants,

Dennis R. and Roberta J. Absher, John M. and Jacqueline Adams, Milton M. Birnbaum, David H. and Darlos Cauble, Carole J. Conti, Peter C. Cullen, David L. and B.P. Cunningham, Donald W. and Lucille Daymon, Louis and Kathe G. Demorales, Larry W. and Cynthia A. Drehs, John R. and S. Linda Elerding, John J. and Sandra K. Fitch, Warren H. and Roberta H. Fox, Leo L. and Chana F. Frischman, Edward F. and Sylvelyn Gill, Lisa and Howard Goldman, Karl G. and Mechtild Grothues, Charles W. and Yvonne Jackman, James L. and Kathy K. Keating, Edyth C. Koch, Elias and Catherine Lazarides, John Masius, Romain Oliver Nelsen, Dhiru G. and Jyoti D. Pate, Ramesh R. Patel, Leonard and Cindy Pearlman, Ronald and Laurie Pearlman, Anthony E. Romero, Andrew and Virginia A. Rudd, James K. Ruxin, Howard and Joan A. Shapiro, Terence T. Stay, Jack Strauss, Michael R. and Elyse E. Sullivan, Donald and Kay A. Volz, William H. Walsh, Ronald

E. and Kathryn Williams, Joseph L. and Wanda Wilson, Charles T. and Carolyn L. Harris, Lee Miller, Arthur M. and Elsie Solender, Stephen L. Solender, and Steve and Arleen Tisherman, Appellants.

No. 90–5918.

United States Court of Appeals, Third Circuit.

Argued May 13, 1991.
Decided June 27, 1991.

Marcus E. Crahan, Jr. (argued), Crahan, Javelera, Ven Halen & Aull, Los Angeles, Cal., for appellants.

Richard E. Moot (argued), Damon & Morey, Buffalo, N.Y., for appellee.

Before HUTCHINSON, COWEN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal raises the question whether investors who sign unconditional promissory notes can raise fraud in the inducement as a defense to enforcement of those notes by the Resolution Trust Corporation (the

"RTC"), where the RTC acquired the notes by taking over a bank that purchased them on the secondary market. The district court granted summary judgment in favor of the RTC, holding that the investors were estopped under the federal common law *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e) from asserting their claims and defenses against the RTC. Because we agree that the investors cannot assert their claims or defenses against the RTC under 12 U.S.C. § 1823(e) and the *D'Oench, Duhme* doctrine, we will affirm.[1]

## I.

Plaintiff investors filed this suit against the promoters of allegedly fraudulent tax shelters in the United States District Court for the Central District of California on September 11, 1986, to rescind promissory notes they signed when they bought those tax shelters. The case was transferred on defendants' motion under 28 U.S.C. § 1404(a) to the United States District Court for the District of New Jersey.

In our previous decision, we summarized the facts leading to this lawsuit.

Plaintiffs executed promissory notes in payment for investments in Madison Partnerships, a series of tax shelters formed to acquire and operate residential real estate properties. Each of the promissory notes were made payable to one of three originator banks: Tri–County Savings & Loan Association of New Jersey, Community Federal Savings & Loan Association of Connecticut, and First Northern Cooperative Bank of New Hampshire. After a series of transfers, the notes came into the possession of defendant Empire of America Federal Savings Bank.

Charging fraud in connection with the investment scheme, plaintiffs filed suit against numerous defendants who allegedly participated in the wrongdoing. Also named as a defendant was Empire, from whom plaintiffs sought rescission of the notes now in the bank's possession. . . .

Empire purchased the thirty-five promissory notes challenged in this appeal for $19.5 million in March 1985 as part of a bulk acquisition of negotiable instruments. According to the bank's affidavits, the practice of acquiring notes through this "secondary market" is an established commercial banking practice. It allows smaller lenders to preserve liquidity and diversify risks, while permitting larger institutions to buy notes at discounted prices.

In November 1984, Consolidated Mortgage Company sold to Empire for $6.1 million a package of 116 notes executed by investors in conjunction with the Madison Partnership venture. In early 1985, Putnam Funding Company offered Empire a similar batch of notes which included the 35 instruments executed by plaintiffs. This collection consisted of 267 notes tendered at a purchase price of $19.5 million dollars.

On March 4, 1985 an Empire representative conducted a four-hour random review of 52 of the 267 loan files associated with the proposed Putnam transaction. He examined the supporting file material, including loan applications, credit reports, disbursal sheets, and current income tax 1040 forms. The documents indicated that the makers of the notes had substantial means, with individual net worths generally in excess of $500,000 and adjusted annual gross incomes usually greater than $100,000. None of the notes was found to be delinquent or beyond maturity.

Empire's representative could not recall whether he had inspected the notes. He did report, however, that he was satisfied with the financial condition of both borrowers and servicer and would recommend the purchase. On the following day, Empire's management loan committee approved the transaction and wired a transfer of $19.54 million dollars to Putnam.

---

**1.** For a complete factual and procedural history of this case *see Adams v. Madison Realty & Dev., Inc.,* 853 F.2d 163, 164 (3d Cir.1988) and *Adams v. Madison Realty & Dev., Inc.,* 746 F.Supp. 419, 422–23 (D.N.J.1990).

On March 20, 1985 an examiner from the Federal Home Loan Bank Board met with Empire's internal auditors to inquire whether the bank had any contact with certain persons then under investigation for conduct unrelated to these purchases. The examiner's list included some of the individuals who had negotiated the sale of the Consolidated and Putnam notes to Empire. The district judge found that the examiner's report, shown to Empire personnel, did not contain specific allegations of fraud and had no apparent connection to the notes under discussion.

．   ．   ．   ．   ．

On March 28, 1985 Empire's Board of Directors ratified the purchase. Twelve days later, the original notes were sent to Empire.

The promissory notes are each two-page, fold-over documents. The front page names the originator bank and sets forth the repayment schedule. The reverse side contains printed agreement conditions and signature lines. Inserted loosely within the fold, lacking any physical attachment to the note, are two sheets of paper containing purported indorsements, the last of which is the transfer from Putnam to Empire. Each note contains a provision directing that its terms be interpreted under the law of the state in which the originator bank is located—New Hampshire, Connecticut, and New Jersey, respectively.

*Adams v. Madison Realty & Dev., Inc.,* 853 F.2d at 164–65 (3d Cir.1988) (*Adams I*) (footnote omitted). In *Adams I*, we held that a good faith purchaser is not a holder in due course of promissory notes containing indorsements on separate sheets of paper loosely inserted within each note.

This appeal involves the same transaction as *Adams I;* namely, Empire's 1985 purchase of 267 promissory notes on the secondary market. On December 11, 1989, after *Adams I* was decided, plaintiffs filed a motion for partial summary judgment against Empire. Empire opposed the motion and filed a summary judgment motion of its own on January 16, 1990. On January 24, 1990, while the cross-motions for summary judgment were pending before the district court, the RTC was appointed conservator of Empire. On February 27, 1990, the RTC was appointed receiver for Empire. That same day, a new federal savings bank ("New Empire") was chartered by the Office of Thrift Supervision to accept the assets and assume the liabilities of Empire. The RTC was appointed conservator of New Empire. Included among the assets of New Empire were the 267 notes at issue in this case. The RTC as the conservator for New Empire has been substituted for defendant Empire in this action.

After it was appointed receiver of Empire, the RTC filed additional briefs in support of Empire's motion for summary judgment. The district court granted summary judgment in favor of the RTC, holding that the plaintiffs were estopped from asserting their claims of fraud in the inducement against the RTC under the federal common law *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e). The district court had jurisdiction under 12 U.S.C. § 1441a(*l*)(1) and 28 U.S.C. 1331. We have jurisdiction under 28 U.S.C. § 1291. Our standard of review is plenary. *See Federal Deposit Ins. Corp. v. Blue Rock Shopping Center, Inc.,* 766 F.2d 744, 745 (3d Cir.1985). Because we agree that the plaintiffs cannot assert their claims or defenses against the RTC under 12 U.S.C. § 1823(e) and the *D'Oench, Duhme* doctrine, we will affirm.

II.

A.

■ Federal common law has long prevented borrowers from raising "secret agreements" in defense to actions to enforce ostensibly unconditional obligations they owe to a bank that the Federal Deposit Insurance Corporation ("FDIC") has taken over. The seminal case on the subject is *D'Oench, Duhme & Co., Inc. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). D'Oench, Duhme & Company was a securities broker and dealer that sold bonds to the Belleville Bank & Trust Company in the 1920s. In

1926, after the bonds defaulted, the bank asked D'Oench, Duhme to sign new notes so that the bank could avoid carrying past due bonds on its books. Payments made on the past due bonds were to be credited against the outstanding balance of the new notes. The receipts for the notes contained the statement, "This note is given with the understanding it will not be called for payment. All interest payments to be repaid." *Id.* at 454, 62 S.Ct. at 678. In 1933, D'Oench, Duhme executed a new note in renewal of the notes it signed in 1926. The president of D'Oench, Duhme who signed the notes was aware that they were executed so that the past due bonds would not appear as assets of the bank, and that the purpose of the interest payments was to " 'to keep the notes alive.' " *Id.*

In 1938, the FDIC acquired the D'Oench, Duhme renewal note in a purchase and assumption transaction after the bank failed. Although the bank had charged off the renewal note in 1935, the FDIC made a demand for payment in 1938. D'Oench, Duhme responded by producing the written receipts which clearly showed the agreement that the note would never be enforced. D'Oench, Duhme also defended by arguing that the note failed for want of consideration.

The United States Supreme Court began its analysis of the question whether the FDIC could enforce the renewal note against D'Oench, Duhme by determining that federal common law governed the enforceability of the note. The Court reasoned that federal common law controlled because the FDIC brought suit under the National Banking Act, the Act of Congress which created the FDIC. The Court found that the Act evidenced a general policy of protecting the FDIC because it contained a specific provision which prohibited the misrepresentation of bank assets.

The Court explained that D'Oench, Duhme violated the policy prohibiting the misrepresentation of bank assets by lending itself to a scheme which had the effect of misleading banking authorities. D'Oench, Duhme's indulgence in allowing the bank to carry the note as an asset

amounted to continuing permission to mislead bank-examining authorities who inspect the bank's assets on an on-going basis. Accordingly, the Court held that D'Oench, Duhme was estopped from raising its secret agreement with the bank as a defense to enforcement of the note. The Court applied this policy to the D'Oench, Duhme renewal note, although the renewal note was executed before the National Banking Act was passed. Indeed, at the time D'Oench, Duhme executed the renewal note, the FDIC was not the insurer of the bank and had not yet even been created.

The rule emerging from *D'Oench, Duhme* is that no agreement between a borrower and a bank which does not plainly appear on the face of an obligation or in the bank's official records is enforceable against the FDIC. Over the years, this doctrine has been applied to the FDIC and the FSLIC in both their corporate and receiver capacities. *See* Note, "Borrower Beware: D'Oench, Duhme and Section 1823 Overprotect the Insurer When Banks Fail," 62 S.Cal.L.Rev. 253 (1988). Given the general applicability of policies underlying the *D'Oench, Duhme* doctrine, we find that this doctrine is also applicable to the RTC.

### B.

The Federal Deposit Insurance Act of 1950 includes a provision, found at 12 U.S.C. § 1823(e), which is generally thought to codify the result reached in *D'Oench, Duhme. See Blue Rock,* 766 F.2d at 753 ("reasonable inference that a purpose of [§ 1823(e)] was to codify the rule of *D'Oench, Duhme*") (footnote omitted). That section provides:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an

adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board of committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e).

The Supreme Court in *Langley*, examined what the word "agreement" in section 1823(e) meant. *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 108 S.Ct. 396, 400, 98 L.Ed.2d 340 (1987).[2] *Langley* involved a suit between a borrower and a bank. The Langleys and Planters Trust & Savings Bank of Opelousas, Louisiana ("Planters"), a bank insured by the FDIC, sued each other over an outstanding note secured by land. Planters sought to collect on the note, while the Langleys sued to avoid payment. The Langleys claimed that Planters induced them to buy a certain parcel of land and to sign notes by making several misrepresentations. Among other things, Planters allegedly misrepresented how many acres the land was, how much of the land consisted of mineral acres, and whether there were outstanding mineral leases burdening the land. No reference to any of these alleged misrepresentations appeared in the documents executed by the Langleys, Planters' records, or the minutes of Planters' board of directors or loan committee meetings.

In April, 1984, the FDIC conducted an examination of Planters at which time it learned of the pending suit between the Langleys and Planters. In May, 1984, the State of Louisiana closed Planters because of its unsound condition and appointed the FDIC as receiver. The FDIC then financed a purchase and assumption transaction in which Planters' assets and liabilities were assumed by another FDIC-insured bank in the community. The FDIC paid the assuming bank a large sum of money in consideration for which the FDIC received, among other things, the Langleys' note that was the subject of the on-going litigation between Planters and the Langleys. In October 1984, the FDIC was substituted as a party to the lawsuit and filed a motion for summary judgment. The Supreme Court ultimately held that in an action brought by the FDIC in its corporate capacity for payment of a note, section 1823(e) bars the defense that the note was procured by fraud in the inducement even when the fraud did not take the form of an express promise. *See Langley*, 108 S.Ct. at 400.

The cornerstone of the Court's decision in *Langley* was the definition of "agreement" in section 1823(e). The Langleys argued that the word "agreement" was limited to express promises to perform acts in the future. The Court disagreed, reasoning instead that as a matter of contractual analysis, the Langleys' defense against the note was that Planters made certain warranties regarding the land, the truthfulness of which was a condition precedent to performance of the Langleys' obligation to pay the note. *Id.* at 401. The Court noted that the word "agreement" is commonly understood to include such conditions to performance. Thus, any warranty on which the performance of a party is conditioned is an "agreement" within the meaning of section 1823(e). Because the Langleys' agreement was not reflected in the records of the bank in accordance with section 1823(e), the Langleys could not assert their claim of fraud in the inducement against the FDIC.

The *Langley* Court observed that its interpretation of the word "agreement" in section 1823(e) was consistent with *D'Oench, Duhme*, because one who signs a facially unqualified note subject to an un-

---

**2.** The current version of section 1823(e) is somewhat different from the version the Supreme Court analyzed in *Langley*. When *Langley* was decided, section 1823(e) read, in relevant part:
No agreement which tends to diminish or defeat the right, title or interest of the Corpo-

ration in any asset acquired by it under this section, either as a loan or by purchase, shall be valid against the Corporation unless certain conditions are met.
*See Langley*, 108 S.Ct. at 400.

written and unrecorded condition upon its repayment has lent himself to a scheme that is likely to mislead banking authorities. *Id.* at 402. Moreover, the Court concluded that knowledge on the part of the FDIC prior to its acquisition of the note was irrelevant to whether section 1823(e) applies. The harm to the FDIC caused by the failure to record the conditions to the apparently unqualified note occurs when the FDIC performs its first examination of the bank, because the FDIC is unable to detect the unrecorded agreement and to protect against it by closing the bank, or taking other action to shore up the bank's financial condition. *Id.* at 403.

The Court also observed that section 1823(e) serves a salutary function of forcing all loans to undergo a formal evaluation. That procedure assures prudent consideration of transactions and safeguards against collusive reconstruction of loans. While contemporaneous knowledge by the FDIC that an otherwise unqualified note was subject to an unrecorded condition would only protect against collusive reconstruction of loans, it would not substitute for the bank complying with section 1823(e) to assure prudent consideration of its loan transactions. In sum, the Court refused to engraft onto section 1823(e) an equitable exception to the plain terms of the statute.

### C.

After *Langley*, Congress made two significant changes to the language of section 1823(e) making it even broader. First, Congress deleted the words "right" and "title" in describing what kind of interest falls within section 1823(e)'s protection. As amended, section 1823(e) provides that "no agreement which tends to diminish or defeat the interest of the Corporation in any asset" is valid against the Corporation unless certain formalities are met. We read the amended version of section 1823(e) to encompass any interest that the FDIC or RTC might have in an asset. Second, Congress made section 1823(e) applicable to the Corporation in both its corporate and receiver capacities, whether the asset was acquired under section 1823 or section

1821. Previously, section 1823(e) extended only to assets acquired by the Corporation under section 1823(e) in its corporate capacity. *See Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1105 (11th Cir.1990).

In light of the fact that Congress expanded section 1823(e) shortly after the Supreme Court decided *Langley* and that Congress did nothing to undermine the Court's broad interpretation of the word "agreement" in section 1823(e), we must read that section, as amended, to give effect to Congress' intent that no agreement not properly reflected in bank records or contained in the language of the agreement itself be available as a defense in an action by the FDIC or the RTC to enforce an otherwise unconditional obligation between a bank and a borrower. The question in this case then is whether the plaintiffs' claims that the 267 notes were procured by fraud can be raised against the RTC as a defense to payment.

### III.

The plaintiffs claim that section 1823(e) does not apply to this case for various reasons. First, they claim that section 1823(e) does not apply to parties who are neither "holders in due course" nor "holders." Since the notes were improperly negotiated to Empire, plaintiffs argue that the RTC and New Empire took only such rights as Empire had, *i.e.* they took the notes as mere transferees and are subject to the plaintiffs' claims of fraud. Second, plaintiffs argue that the RTC has no "interest" in the notes within the meaning of section 1823(e), because the notes were rescinded by operation of law when the plaintiffs filed suit in California. If the notes were in fact rescinded, the plaintiffs claim that the RTC took no "asset" that could fall within the purview of section 1823(e)'s protection. Third, they claim that the *D'Oench, Duhme* doctrine does not apply because there was no "secret agreement" between the plaintiffs and Empire or the RTC, that *D'Oench, Duhme* and section 1823(e) only apply to agreements between a bank and its obligor, and that neither the statute nor the doctrine are applicable in

this case because bank examiners had actual knowledge that the notes were fraudulent when Empire first purchased them and when the RTC took over Empire.

## A.

■ We must reject out of hand plaintiffs' contention that section 1823(e) does not apply to parties who are neither "holders in due course" nor "holders" under the applicable provisions of the Uniform Commercial Code. Section 1823(e) requires only that the RTC have an "interest" which the alleged agreement could diminish or defeat. It does not require that the "interest" be accorded particular status by the U.C.C. *See, e.g., Langley,* 108 S.Ct. at 402 (the transfer to the FDIC of voidable title is enough to constitute an interest under section 1823(e)). The fact therefore that the RTC is not a holder or a holder in due course is irrelevant. The RTC, as a transferee of the notes, has an "interest" which the plaintiffs' claims of fraud tend to diminish and defeat.

## B.

We must also reject plaintiffs' next contention that section 1823(e) does not apply to this case because the notes were rescinded before the RTC could have obtained an "interest" in them. Plaintiffs argue that under California law, a party can effect a unilateral rescission by giving notice of the rescission and restoring to the other party every benefit received under the contract to be rescinded. *See* Cal.Civ.Code § 1691 (West 1985).[3] Claiming that the statutory requirements for rescission were met, the plaintiffs argue that the RTC did not acquire any "interest" in the notes when it became receiver of Empire's assets because the notes were already rescinded. If the

notes were already rescinded, section 1823(e) would not apply because there would be no "asset" to which any interest could attach.

The plaintiffs' argument in this regard presupposes that California law governs this dispute. They boldly assert that "California law applies because the notes were made and rescinded in California; the fraud was committed in California; and the litigation was commenced in California. *Firens [Ferens] v. John Deere Co.,* 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990)." Appellant's Brief at 14 n. 3.

■ We believe, however, that federal common law governs the question whether plaintiffs effectively rescinded the notes merely by filing a lawsuit in California. Under 12 U.S.C. § 1441a(*l*)(1), any civil action in which the RTC is a party is deemed to arise under federal law. Under *D'Oench, Duhme,* section 1441a(*l*)(1) alone would be enough to warrant application of federal common law. *D'Oench, Duhme,* 315 U.S. at 455–56, 62 S.Ct. at 678–79. But we need not rely solely on *D'Oench, Duhme,* because recent precedent confirms that we should apply federal common law to determine the rights and interests of parties to negotiable instruments where the FDIC or RTC is a party. *See, e.g., Blue Rock,* 766 F.2d at 746–48 (federal common law, rather than state law, applied to negotiable instrument in action by FDIC to recover on bond even though parties selected Delaware law to govern the instrument); *see also Federal Deposit Ins. Corp. v. Fisher,* 727 F.Supp. 1306, 1310–11 (D.Minn.1989) (federal, as opposed to Minnesota law, governed dispute regarding promissory notes which the FDIC sought to enforce after its appointment as receiver

---

3. Cal.Civ.Code § 1691 reads in relevant part: Subject to Section 1693, to effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind . . .:

    (a) Give notice of rescission to the party as to whom he rescinds; and

    (b) Restore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise,

unless the latter is unable or positively refuses to do so.

When notice of rescission has not otherwise been given or an offer to restore the benefit received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both.

Cal.Civ.Code § 1691 (West 1985).

for bank, even though notes specifically provided that Minnesota law would govern the notes).

■ We have recognized three factors in determining whether federal common law should apply, as opposed to the law selected by the parties: first, whether the nature of the federal program requires national uniformity; second, whether the application of state law would frustrate specific objectives of the federal program; and third, whether the application of federal law would disrupt commercial relationships predicated on state law. *Blue Rock*, 766 F.2d at 748 *(citing United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979)).

■ Applying these factors to the facts of this case, we find that federal common law provides the rules of decision. First, Congress has demonstrated a strong interest in protecting federal banking agencies from secret agreements. We would undermine this policy by allowing the effectiveness of section 1823(e) to hinge on the peculiarities of state law. Second, the application of the California rule urged by plaintiffs would undermine the clearly established goals of section 1823(e) and the *D'Oench, Duhme* doctrine. Third, the application of federal law in this case would not disrupt commercial relations, since everyone is presumed to know the law, and federal common law has always been applied in this kind of case. Hence, we conclude that federal common law governs this transaction. Since plaintiffs have not argued that the notes were rescinded under any generally applicable principle of contract or commercial law, we must assume that their argument falls if we decline to apply California law. We conclude then that the notes were not rescinded by the mere filing of a law suit in California. Hence the RTC did acquire an "interest" in

"assets" covered by section 1823(e) and the *D'Oench, Duhme* doctrine.

■ Even if we were required to apply California law to this transaction because plaintiffs filed suit in California, we would still take issue with plaintiffs' assumption that California law would determine whether the notes had been rescinded. Indeed, even a cursory examination of California law suggests that California law would not provide the substantive rules of decision in this case.

Under section 1105(1) of the California Commercial Code, parties to a transaction can elect to have their transaction governed by the law of any state that bears an appropriate relationship to the transaction.[4] *See, e.g., Bos Material Handling, Inc. v. Crown Controls Corp.*, 137 Cal.App.3d 99, 108–09, 186 Cal.Rptr. 740, 744–45 (1982) (choice of law provisions in contracts are given effect where transaction bears a reasonable relation to state chosen by the parties). Since there is no doubt that a California court would apply its commercial code to commercial paper executed in California, we must look to the notes to see if the choice of law election in each note bears an appropriate relationship to the state whose law was selected.

■ The promissory notes at issue in this case all contained one of three choice of law provisions. Each note designated either New Jersey, Connecticut, or New Hampshire law as the governing law, depending upon where the originator bank was located. One originator bank was in New Jersey; the second was in Connecticut; and the third was in New Hampshire. Because each note that was payable to a New Jersey bank contained a clause selecting New Jersey law, and each note payable to a Connecticut bank selected Connecticut law, etc., it follows that the state selected by each note bears an appropriate relationship to the transaction. Under California

4. Section 1105 reads in relevant part:
   1105. Territorial Application of the Act; Parties' Power to Choose Applicable Law.
   (1) Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law

either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this code applies to transactions bearing an appropriate relation to this state.
Cal.Com.Code § 1105 (West Supp.1991).

law then, we would respect the choice of law election made in the notes. Since none of the notes selected California as the governing law, California law would not govern the question whether the notes had been rescinded when the RTC acquired them.[5]

## C.

The plaintiffs next contend that they are not relying on a "secret agreement" that falls within the *D'Oench, Duhme* doctrine to avoid liability. The plaintiffs insist that they never made an agreement of any kind with anyone, much less a "secret agreement" which duped bank examiners into relying on the validity of facially valid commercial paper. They never spoke directly to anyone at any of the banks involved in the swindle and never had any contact with Empire. This argument misapprehends *Langley*'s construction of the word "agreement" in section 1823(e).

█ The word "agreement" in section 1823(e) is not limited to express agreements between a bank and a borrower. Rather, an "agreement" includes any warranty on which the performance of a party is conditioned. Plaintiffs claim that the people who sold them the tax shelters made a variety of promises which they breached. For instance, plaintiffs allege that the promoters of the fraudulent tax shelters represented that they would acquire and restore certain historic condominium units. In fact, plaintiffs allege, the promoters failed even to acquire over 200 of those units. Plaintiffs also detail numerous other specif-

ic representations and warranties that the defendants breached.

Conceptually, these representations and warranties are promises, the truth of which are conditions precedent to the plaintiffs' obligations to repay the notes. *See Langley*, 108 S.Ct. at 401. Thus, under *Langley*, they are "agreements" that fall within section 1823(e). Plaintiffs can only raise the existence of these false representations and warranties as defenses to the RTC's action to the extent they have complied with the formalities of section 1823(e), *i.e.* to the extent these promises were made a part of the bank's official records. Since plaintiffs did not make these promises part of the official records, they are estopped from raising their claims of fraud in the inducement against the RTC. It is therefore of no moment that the plaintiffs never made an express agreement and had no contact with anyone either at the originator banks or at Empire. Plaintiffs' claims of fraud in the inducement nevertheless fall within section 1823(e) and the *D'Oench, Duhme* doctrine and they cannot be raised against the RTC.

## D.

In a related argument, plaintiffs contend that *D'Oench, Duhme* and section 1823(e) only apply to agreements between a bank and its obligor. In *Blue Rock*, we held that neither *D'Oench, Duhme* nor section 1823(e) applied to an agreement between a principal and a surety because "Section 1823(e) is directed at agreements between a bank and its obligor showing or attempting to show that the obligation was illusory or

---

**5.** Even if California law did provide the substantive rules of decision, we would nevertheless conclude that the RTC acquired an "interest" in an "asset" within the meaning of section 1823(e) and the *D'Oench, Duhme* doctrine. Under California law, a party can unilaterally rescind a contract by complying with the statutory procedure. To obtain relief based on the out-of-court rescission, however, the rescinding party must file a lawsuit. *See* Cal.Civ.Code § 1692 (West 1985). The court where suit is filed can determine that the contract was not rescinded. *Id.; See also Sweet v. Relis*, 275 Cal.App.2d 257, 79 Cal.Rptr. 829 (1969).

Because section 1823(e) and the *D'Oench, Duhme* doctrine require only that the FDIC have

some interest in some asset, we would hold that the RTC acquired both an "interest" and an "asset" as long as it is possible that a California court could find either that the promissory notes were not rescinded or that the plaintiffs were not entitled to relief based on the out-of-court rescission. Our conclusion would undoubtedly be different if plaintiffs had obtained relief based on their out-of-court rescission before the RTC acquired an interest in the 267 notes at issue in this case. *See, e.g., Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 275 (5th Cir.1989). As it stands, however, the RTC did acquire an "interest" in an "asset" within the meaning of section 1823(e) and the *D'Oench, Duhme* doctrine.

conditional." *Blue Rock,* 766 F.2d at 754. Based on our statement in *Blue Rock,* plaintiffs assert that *D'Oench, Duhme* and section 1823(e) do not apply in this case because plaintiffs were not Empire's obligors. Once again, we must reject plaintiffs' argument.

■ First, *Langley* makes it clear that the "agreement" covered by section 1823(e) and the *D'Oench, Duhme* doctrine extends to any warranty on which a party's performance is conditioned. There is absolutely no indication that the Court's reasoning should be limited to obligations between a bank and its obligor. To the extent then that *Blue Rock,* a case decided before *Langley,* is inconsistent with the Supreme Court's opinion in *Langley,* our statement in *Blue Rock* must yield.

■ Second, plaintiffs are Empire's obligors. Plaintiffs executed commercial paper which was transferred from one party to another and eventually came to rest in Empire's hands. While it may be true that absent Empire's insolvency, section 1823(e), and the *D'Oench, Duhme* doctrine, Empire would have taken the paper subject to the plaintiffs' defenses, Empire is nevertheless the entity to which plaintiffs' obligations to pay run. In common parlance, plaintiffs are the obligors and Empire is the obligee/bank. Hence, section 1823(e) and the *D'Oench, Duhme* doctrine do apply to this case.

### E.

Plaintiffs' final argument is that the RTC may not rely on section 1823(e) or *D'Oench, Duhme* because federal bank examiners had actual knowledge of the defects in the promissory notes at the time Empire purchased them. Because this appeal is before us on cross-motions for summary judgment, we will assume that the bank examiners had such knowledge. Knowledge on the part of bank examiners is, however, irrelevant.

In *Langley,* the Supreme Court expressly held that knowledge by a banking agency prior to its acquisition of a note is not relevant to the question whether section 1823(e) applies. *Langley,* 108 S.Ct. at 402. The Court explained that the policy behind section 1823(e) was two-fold. First, it promotes mature consideration of loan transactions. Second, section 1823(e)'s formalities guard against collusive reconstruction of loan terms by bank officials and borrowers. Knowledge by the FDIC could only protect against the danger of collusive reconstruction of loan terms if the FDIC learned of the side agreement when it was being made, but it could not substitute for mature consideration of loan transactions. *Id.* at 403. By preventing side agreements not conforming to the requirements of section 1823(e), Congress insured that bank records would be complete so that a bank's solvency could be determined literally overnight.

■ Turning to the facts of this case, we find that knowledge by federal banking authorities was irrelevant. First, this conclusion is compelled by the clear language in *Langley.* We have no choice but to follow the controlling precedent of the Supreme Court. Second, even if we had a choice and we could ourselves engraft an equitable exception onto section 1823(e), we would not do it in this case. Plaintiffs may not be guilty of any wrongdoing either legally or morally, but they knew that they were signing unconditional promises to pay. We will not allow them to avoid their obligations now because by a lucky accident, the notes were not properly negotiated to Empire. While it may be true that if the RTC had not taken over Empire, Empire would have taken the notes subject to the plaintiffs' defenses, the fact that the plaintiffs knew they were creating negotiable instruments mitigates whatever sympathy we may otherwise have had for the plaintiffs' plight.

### IV.

Section 1823(e) and *D'Oench, Duhme* apply to this case because plaintiffs' claims of fraud in the inducement are "agreements" within the meaning of both the statute and the common law *D'Oench, Duhme* doctrine. Plaintiffs' cannot raise their claims to defend against the RTC's motion for

summary judgment. We will therefore affirm the judgment of the district court in every respect. Tax costs against appellants.