OPINION OF THE COURT
COWEN, Circuit Judge.
This breach of contract and fraud action is brought by real estate owners against the Resolution Trust Corporation (“RTC”) in its capacities as receiver for Carteret Savings Bank and as conservator of Carteret Federal Savings Bank. The district court granted the RTC’s motion to dismiss brought pursuant to Fed.R.Civ.P. 12(b)(6). Because we find that 12 U.S.C. § 1823(e) bars plaintiffs-appellants’ cause of action against the RTC, we will affirm the district court’s order of dismissal.
I.
The following facts are alleged in plaintiffs’ complaints. The plaintiffs are the victims of a widespread fraud perpetrated by General Development Corporation (“GDC”). GDC was one of the largest land development companies in Florida. It primarily sold real estate to out-of-state residents using monthly installment contracts. GDC’s advertisements touted its low down payments and small monthly payments as making the “Florida dream” widely affordable.
After purchasing a GDC lot, GDC customers were encouraged to use the “equity” they had built up in their property as a down payment on a GDC house or condominium. They were given, among other inducements, roast beef suppers at the local Holiday Inn, flyers portraying the joys of GDC home ownership, and personal attention by GDC sales representatives. During these sessions, prospective purchasers were told that, after taxes and rental income, the cost of owning a GDC home would be only slightly more than the payments they were making for then-vacant lots.
Interested pre-qualified buyers were invited to travel to Florida to visit a GDC community and to choose a home from among numerous GDC models. The cost of the trip ($299.00) could be applied against the sales price if they purchased a house or eondomini- *779 m GDC representatives accompanied prospective purchasers from the time they departed for Florida until the time they returned home. While in Florida, they stayed at GDC-seleeted hotels, dined with GDC personnel, and traveled with GDC sales representatives to GDC communities. The GDC contract to purchase was signed during the trip. Under no circumstances were the purchasers allowed to extend their Florida stay or view other real estate development communities.
In addition to these hard-sell sales tactics, the GDC customers were persuaded to apply for a mortgage from GDC’s “designated lender,” GDY Financial Corporation (“GDY’). GDV, a wholly owned subsidiary of GDC, was created to finance the purchase of GDC houses, and to sell and service the mortgages. As part of the loan process, GDV had the GDC houses appraised. These appraisals failed to comply with industry guidelines.[1] Instead, the homes were appraised in conformance with GDC’s inflated selling price. The houses were highly overvalued, and the mortgages were for amounts far greater than the market value of the real property that secured them. The purchasers did not seek independent appraisals, nor did they retain legal representation in purchasing the real estate.
GDV entered into an arrangement with several institutional investors to sell the mortgages. One of those investors, Carteret Savings Bank (“Carteret”), a federally insured savings & loan, bought the mortgages despite the non-conforming appraisals. Car-teret allegedly was aware of the non-conforming appraisals, and purchased the mortgage loans with certain credit enhancements: it required GDV to obligate itself to repurchase the loans in ease of a default, and further required that GDYs performance be secured by letters of credit and cash deposits.
On December 4, 1992, the Office of Thrift Supervision ordered Carteret closed and appointed the RTC as its receiver. On that same date, the assets of the former Carteret were transferred to Carteret Federal Savings Bank, a newly chartered federal savings association, and the RTC was appointed conservator of the new bank.
Following an investigation, GDC as well as its directors were indicted and convicted of criminal fraud and conspiracy to commit fraud. Both GDC and GDV filed for protection under Chapter 11 of the Bankruptcy Code. GDC emerged from bankruptcy as Atlantic Gulf Communities Corporation and GDV was dissolved.
GDC customers Riecardo and Ruth Dimu-zio filed an action in the United States District Court for the District of Columbia against the RTC as conservator of Carteret Federal Savings Bank and Carteret Savings Bank. Kazuyuki Kameda, Taneko Kameda and Esmie Wint filed a class action against the RTC on behalf of those persons who obtained mortgage financing from GDV in the United States District Court for the District of Columbia. These actions were transferred to the United States District Court for the District of New Jersey, and consolidated by order of the district court on October 19, 1994.
Each complaint alleged, inter alia, breach of fiduciary duty, breach of contract, fraudulent concealment, mortgage fraud, and unfair and deceptive trade practices. Plaintiffs allege that GDV knew and failed to disclose that: (1) the loan arranged would result in the purchasers losing their cash equity in the lot they traded in; (2) the GDV appraisal of the housing unit was inaccurate and did not conform to industry standards; (3) no lender applying industry standards would accept the GDV appraisal or make a purchase money loan in the amount requested; and (4) GDV, because of its GDC-eontrolled status, had a conflict of interest and did not intend to negotiate a conventional arms-length loan as requested by the purchasers in their loan applications. Plaintiffs further allege that Carteret knew or should have known of GDC’s and GDYs concealment of material facts upon which the notes were secured.
*780 The district court dismissed the complaints pursuant to Fed.R.Civ.P. 12(b)(6), holding that plaintiffs’ causes of action were precluded by Adams v. Madison Realty & Development, Inc., 937 F.2d 845 (3d Cir.1991) and 12 U.S.C. § 1823(e).[2] This appeal followed.
II.
The district court had jurisdiction over this case under 12 U.S.C. § 1441a(i )(1) and 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. This is an appeal from the district court’s dismissal of the plaintiffs’ complaints pursuant to Fed. R.Civ.P. 12(b)(6). Accordingly, our review is plenary. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993).
III.
The Federal Deposit Insurance Act of 1950 includes a provision, 12 U.S.C. § 1823(e), which is generally thought to codify the result reached in D’Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). See Adams v. Madison Realty & Development, Inc., 937 F.2d 845, 852 (3d Cir.1991) (citing FDIC v. Blue Rock Shopping Center, Inc., 766 F.2d 744, 745 (3d Cir.1985)). Section 1823(e) provides:
No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it ... either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
(1) is in writing,
(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be re-fleeted in the minutes of said board or committee, and
(4)has been, continuously, from the time of its execution, an official record of the depository institution.
One purpose of this section is to permit federal and state bank examiners accurately and quickly to assess the financial condition of a federally insured depository institution by examining its books and records. The statute accomplishes this objective, in part, by limiting the enforceability of “agreements” affecting the institution’s assets held by the receiver to those that are properly recorded in the books and records of the institution. See Langley v. FDIC, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).
A second purpose of § 1823(e), implicit in its requirement that the agreement be executed “contemporaneously” with the acquisition of the asset and approved by officially recorded action of the bank’s board or loan committee, is to “ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.” Langley, 484 U.S. at 91, 108 S.Ct. at 401.
The Supreme Court has construed the word “agreement” broadly in the context of § 1823(e). In Langley, the plaintiffs purchased real estate from a federally insured bank and were obligors on an unconditional promissory note. When the bank sought to collect on the note, the Langleys sued to avoid payment, claiming that the bank had made misrepresentations concerning the value and amount of the real estate at issue. After the bank failed, the FDIC was substituted as a party.
The Langley Court held that § 1823(e) bars a claim of fraud in the inducement when an obligor seeks to avoid payment on a note *781 that has come into the FDIC’s possession. The Court reasoned that for purposes of the statute, the term “agreement” includes warranties concerning real estate, the truthfulness of which is a condition precedent to the Langleys’ obligation to pay the note. Because this “agreement” had not been recorded on the bank’s records, the Court held that the defense of fraud in the inducement was statutorily barred.
In Adams, 937 F.2d at 845, we held that § 1823(e) extends to any warranty on which a party’s performance is conditioned, and is not limited to obligations made between a bank and its obligor. In Adams, the plaintiffs had executed promissory notes for investments in fraudulent tax shelters. Although each of the notes was payable to one of three originator banks, the notes were' eventually purchased on the secondary market by Empire of America Federal Savings Bank, a federally regulated savings and loan. The RTC was appointed as conservator of Empire and came into possession of the notes. The Adams court held that plaintiffs had not made the agreement, i.e., representations and warranties related to the fraudulent tax shelters, part of the official bank record. Thus, the requirements of § 1823(e)(3) were not satisfied.
The Adams court specifically rejected the plaintiffs’ claim that § 1823(e) was inapplicable in cases where the obligors had no direct dealings with a federally regulated depository institution:
Langley makes it clear that the “agreement” covered by § 1823(e) and the D’Oench doctrine extends to any warranty on which a party’s performance is conditioned. There is absolutely no indication that the Court’s reasoning should be limited to obligations between a bank and its obligor.
Adams, 937 F.2d at 858. Therefore, § 1823(e) applies to agreements between an obligor and parties other than a depository institution.
A.
A threshold question exists in this case as to what is the “agreement” that diminished or defeated the interest of the RTC in its acquisition of the subject promissory notes. Appellants contend, and the district court found, that the “agreement” sought to be enforced is the home appraisals and the Loan Purchase Agreements between GDV and Carteret. The district court concluded that the “agreement” in the form of the Loan Purchase Agreements and the appraisals met the “in writing” requirement of § 1823(e)(1).
Although the appraisals may be evidence of the alleged fraud, they are not a written form of the representations and warranties regarding the real estate, the truthfulness of which is a condition precedent upon which the plaintiffs base their claims. Specifically, the appraisals were not a bargained for promise or warranty that the real estate was priced at market value. See, Langley v. FDIC, 484 U.S. at 91, 108 S.Ct. at 401 (“agreement” under § 1823(e) is a warranty or a promise which imposes duties or conditions). Similarly, the Loan Purchase Agreements did not diminish the interest of the RTC; nor were the plaintiffs parties to these agreements. Accordingly, we reject the district court’s conclusion that the “agreement” in this case is the appraisals and Loan Purchase Agreements.
Representations and warranties regarding the real estate, the truthfulness of which was allegedly a condition precedent to the plaintiffs’ obligations to repay the notes, would constitute an “agreement” that diminishes the interest of the RTC. There are no allegations that such an “agreement” was put in writing. Therefore, the agreement in this case does not meet the “in writing” requirement of § 1823(e)(1).[3]
*782 B.
Appellants next assert that because § 1823(e) always would bar a claim in a situation such as the one presented in this case, we should decline to apply it. The obligors here seek to avoid payment on promissory notes which have been purchased by a depository institution on the secondary market. They claim that such an “agreement” could never be executed by the depository institution and the obligor contemporaneously with the depository institution’s acquisition of the asset as required by § 1823(e)(2).
The fact that it is not possible for the representations and warranties made in this ease to constitute an “agreement” that meets the contemporaneous requirement of § 1823(e)(2), however, does not inextricably lead to the conclusion that Congress did not intend the recording statute to apply in these cases, or that an exception should be carved out of the statute. Adams teaches that § 1823(e) applies to “agreements” between obligors and third parties and, therefore, applies in this case. Adams cannot be overruled except by an in banc court. IOP Chapter 8. Hearing or Rehearing in Banc.
We note that every other court of appeals that has considered this issue has come to the same conclusion as we did in Adams. See Victor Hotel Corp. v. FCA Mortg. Corp., 928 F.2d 1077, 1083 (11th Cir.1991) (§ 1823(e) does not only apply where the note is initially executed in favor of a bank); Chatham Ventures, Inc. v. FDIC, 651 F.2d 355, 360-61 (5th Cir. Unit B 1981) (§ 1823(e) makes no exception for agreements initiated by a third party and the obligors), cert. denied, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982).[4]
Appellants contend that Adams is distinguishable because the representations at issue in Adams wore oral, while the “agreement” here, the Loan Purchase Agreements and appraisals, was in writing. As we have determined that the “agreement” in this case — the representations and warranties made by GDV and GDC to the plaintiffs— was not in writing, Adams is not distinguishable on this basis.
Appellants also argue that Adams is distinguishable because the Adams court affirmed the district court’s grant of summary judgment whereas here the district court granted defendant’s motion to dismiss without giving appellants the opportunity to discover Carteret’s records at the time it purchased the notes. This argument must also be rejected. Accepting, as we must, all allegations of fact as true, appellants would not be entitled to relief under any state of facts which could be proven in support of their claims. Appellants concede the point by arguing that § 1823(e)(2)’s contemporaneous requirement could not possibly be met under the facts of this case.
Appellants next assert that because of market realities, an Obligor whose promissory note is purchased on the secondary market can never execute an agreement contemporaneously with the bank’s acquisition of the note, and, therefore, an equitable exception to the statute should apply in this case. They claim that the Adams court did not recognize such an equitable exception because the appellants in Adams knew that they were creating negotiable instruments, whereas here, the appellants did not know their notes were negotiable. This distinction is not dispositive. We agree that Adams raised the issue of the possible availability of an equitable exception to § 1823(e). That discussion, however, was dictum included in the opinion after the court had already held that § 1823(e) applied in that case. The *783 Langley Court similarly rejected the availability of an equitable exception after it reached its holding. Langley, 484 U.S. at 96, 108 S.Ct. at 403. We likewise will not carve out an equitable exception.
As the Supreme Court stated in Langley, “Congress opted for the certainty of ■ the requirements set forth in § 1823(e).... Such a categorical recording scheme is of course not unusual.” Langley, 484 U.S. at 95, 108 S.Ct. at 403. Either the statutory requirements are met or they are not. We cannot ignore the plain language of the statute and binding precedent of our court to reach an arguably more equitable result. If Congress wishes to provide relief to obligors whose promissory notes were procured by fraud and later transferred on the secondary market to a federal insured depository institution, it may amend the statute accordingly. We have no reason to believe that Congress intended to exempt from the recording statute a situation such as the one presented in this case.[5]
The order of the district court dismissing plaintiffs’ complaints pursuant to Fed. R.Civ.P. 12(b)(6) will be affirmed.

. Those guidelines are established by the Federal National Mortgage Corporation (“FNMA”) and Federal Home Loan Mortgage Corporation (“FHLMC”), respectively the first and second largest purchasers of residential homeowners’ mortgages.

. Although the RTC advanced a number of grounds in support of its motion to dismiss, the district court relied upon § 1823(e) to decide the motion. On this appeal, the RTC seeks an affir-mance on this statutory basis. Accordingly, our discussion is limited to § 1823(e), and we need not apply the federal common law doctrine of D’Oench, Duhme. Indeed, we note that the D’Oench, Duhme doctrine may no longer be a separate bar to plaintiffs' claims. See, O’Melveny & Myers v. FDIC,-U.S.-, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); Murphy v. FDIC, 61 F.3d 34 (D.C.Cir.1995).

. One purpose of the writing requirement in § 1823(e) is to enable bank examiners to make reliable examinations of the bank's worth. Langley, 484 U.S. at 91, 108 S.Ct. at 401. Judge Sarokin in his dissent maintains that, in this case “the RTC could evaluate the worth of Carteret’s assets and examine these appraisals and agreements and indeed, discover the fraud alleged by the plaintiffs.” Dissent at 785. We respectfully disagree. Plaintiffs' complaints allege that the official bank record included appraisals stating that they were not made in accordance with FNMA/FHLMC guidelines, and that Carteret was aware of this fact when it bought the Loan Pur *782 chase Agreements. We cannot say, based on these allegations, that the official bank record showed on its face that the notes were procured by fraud in the inducement. Nor can we conclude, as Judge Sarokin does, that these documents put the bank examiners "on notice" of the real worth of the assets. Dissent at 785-86.

. Judge Sarokin in his dissent suggests there is an emerging circuit split on whether the contemporaneous requirement must be strictly interpreted. Dissent at 787. However, the case upon which he principally relies, RTC v. Midwest Federal Sav. Bank of Minot, 36 F.3d 785, 797-98 (9th Cir.1993), did not involve a note that was purchased on the secondary market. Moreover, FDIC v. Manatt, 922 F.2d 486 (8th Cir.1991) expressly left open the question of the reach and scope of § 1823(e)(2). Id. at 489 n. 4.

. Judge Sarokin argues in his dissent that the contemporaneous requirement "must be read in light of commercial reality. When there exists a secondary market for mortgage notes, the original loan and subsequent acquisition will never be precisely contemporaneous.” Dissent at 787. We agree that it is virtually impossible for an original loan and subsequent acquisition on a secondary market to be made contemporaneously. We further agree that there is a dearth of legislative history to this statute. However, it is hornbook law that in interpreting undefined statutory language, we must look to the term's common usage and general acceptance. Hertz Corporation v. United States, 268 F.2d 604, 607 (3d Cir.1959), aff'd, 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603 (1960). “Contemporaneous” means "living, existing or occurring at the same time.” Webster's New Int’l Dictionary 575 (2nd ed. 1959). Therefore, we respectfully disagree with Judge Sarokin that Congress intended contemporaneous to mean "not precisely contemporaneous.” We conclude that any "agreement" that is not entered into at the same time as the acquisition of the asset fails to meet the contemporaneous requirement of § 1823(e)(2).